IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

BIKACHI AMISI,
　　Plaintiff,

v.　　　　　　　　　　　　　　　　　　Civil No. 3:20cv218 (DJN)

RIVERSIDE REGIONAL JAIL
AUTHORITY, *et al.*,
　　Defendants.

## **MEMORANDUM OPINION**

Plaintiff Bikachi Amisi ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983

against Defendants Riverside Regional Jail Authority (the "Authority"), Bryan Brown

("Brown"), Roy Townsend, Jr. ("Townsend"), and Lakeyta Brooks ("Brooks") (collectively,

"Defendants"), alleging that Defendants violated her constitutional rights by subjecting her to a

strip search as she entered Riverside Regional Jail (the "Jail") on her first day working as a nurse

for the Jail's healthcare contractor.  Plaintiff also brings claims under state law for negligence,

gross negligence, willful and wanton negligence, false imprisonment, and intentional and

negligent infliction of emotional distress.

This matter now comes before the Court on the Motions to Dismiss (ECF Nos. 12, 14,

16) filed by the Authority, Townsend and Brown.[1]  Because Plaintiff concedes in her Response

(ECF No. 19) to the Authority's Motion (ECF No. 12) that the Authority enjoys sovereign

---

[1]　　Notably, due to delays in service, Brooks has yet to file a motion to dismiss or other
responsive pleading.  However, in the interests of justice and judicial economy, where Plaintiff's
facts fail to state a claim against Brooks for the same reasons that Plaintiff fails to state a claim
as to the other Defendants, the Court also dismisses those claims as to Brooks.

immunity from suit in this matter, the Court GRANTS the Authority's Motion to Dismiss (ECF No. 12) and DISMISSES WITH PREJUDICE all claims by Plaintiff against the Authority.[2] Therefore, the Court need only address the remaining Motions to Dismiss (ECF Nos. 14, 16) filed by Townsend and Brown, which move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss Plaintiff's claims against them.

For the reasons set forth below, the Court GRANTS IN PART and DENIES IN PART Townsend's Motion to Dismiss (ECF No. 14) and Brown's Motion to Dismiss (ECF No. 16). The Court DISMISSES WITH PREJUDICE Count One of Plaintiff's Complaint (ECF No. 1) as to all Defendants and DISMISSES WITHOUT PREJUDICE Count Six as to Townsend and Brooks.

## I.    BACKGROUND

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept Plaintiff's well-pleaded factual allegations as true, though the Court need not accept Plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, to the extent that Defendants raise substantive challenges to the Court's jurisdiction over the subject matter of Plaintiff's Complaint, the Court may consider facts outside of the Complaint and need not accept the allegations in the Complaint as true. *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009). With these principles in mind, the Court accepts the following facts.

---

[2]     Dismissal with prejudice of Plaintiff's claims against the Authority proves appropriate, because Plaintiff concedes that no set of facts could overcome the Authority's sovereign immunity. *See Billups v. United States*, __ F. Supp. 3d __, 2020 WL 215500, at *6 n.1 (E.D. Va. Jan. 14, 2020) (dismissing with prejudice the plaintiff's claims for direct liability against the federal government, because the plaintiff conceded that no set of facts could sustain such claims (citations omitted)).

### A.      Factual Background

The Authority serves the cities of Hopewell, Petersburg and Colonial Heights, Virginia, as well as the counties of Prince George, Surry, Charles City and Chesterfield. (Compl. (ECF No. 1) ¶ 13.)  As part of its responsibilities, the Authority operates the Jail, which houses inmates on behalf of the above localities. (Compl. ¶ 13.)  During the relevant period, Townsend, Brown and Brooks served as correctional officers at the Jail. (Compl. ¶¶ 14-16.)  On Thursday, September 5, 2019, Plaintiff reported to the Jail to begin her orientation as part of an eight-week assignment as a nurse at the facility, working on behalf of a staffing agency that staffed the Jail's medical contractor. (Compl. ¶ 17.)

As she arrived at the Jail, Plaintiff had difficulty navigating the Jail complex. (Compl. ¶ 18.)  Plaintiff observed Brown standing outside one of the buildings and asked him for assistance. (Compl. ¶ 18.)  Plaintiff informed Brown that she had been assigned as a nurse at the Jail, and Brown directed Plaintiff to the appropriate parking lot and building. (Compl. ¶ 19.)  Plaintiff parked her vehicle and approached the building identified by Brown. (Compl. ¶ 20.)  Plaintiff wore her nurse's scrubs and carried her wallet, water bottle and lunch. (Compl. ¶ 20.)

Unbeknownst to Plaintiff, Brown had directed her to the wrong building, and she in fact entered the Jail's Pre-Release Center, where her orientation was not being held. (Compl. ¶ 21.)  The Pre-Release Center houses inmates referred to as "Weekenders," who serve their sentences only on weekend days. (Compl. ¶ 21.)  Brown unlocked and escorted Plaintiff through the Pre-Release Center's secure sally port entrance, the same entrance used by Weekenders to begin their weekend sentences. (Compl. ¶¶ 21-23.)  Contrary to jail policy, Brown did not verify Plaintiff's status as a Weekender before opening the secure sally port entrance and escorting Plaintiff into the Pre-Release Center. (Compl. ¶ 23.)

Upon entering the Pre-Release Center, Plaintiff approached Townsend, the Center's intake officer that day. (Compl. ¶ 24.)  Without confirming Plaintiff's status as a Weekender, Townsend opened a second secure door and escorted Plaintiff into the intake area of the Center. (Compl. ¶¶ 25-26.)  Once inside the intake area, Plaintiff informed Townsend about her work assignment and orientation. (Compl. ¶ 27.)  Townsend then directed Plaintiff to take a seat and Plaintiff complied. (Compl. ¶ 28.)

After Plaintiff sat down, Brooks entered the intake area and spoke with Townsend. (Compl. ¶ 29.)  Although Plaintiff could not hear their conversation, Brooks and Townsend pointed at Plaintiff and appeared to be talking about her. (Compl. ¶ 29.)  Following her conversation with Townsend, Brooks asked Plaintiff to follow her into the female locker room. (Compl. ¶ 30.)  Plaintiff attempted to take her lunch and water bottle into the locker room, but Brooks informed her that she could not bring those items inside the facility. (Compl. ¶ 31.) Plaintiff asked if she could return her lunch and water bottle to her vehicle, at which point Brooks informed Plaintiff that she could not leave the Center once inside. (Compl. ¶ 31.) Townsend also refused to hold Plaintiff's lunch, directing Plaintiff to throw it away, though he agreed to keep her water bottle. (Compl. ¶¶ 32, 34.)  At this point, Plaintiff began shaking in fear. (Compl. ¶ 33.)  Despite Plaintiff's behavior and the fact that Plaintiff's name did not appear on the list of Weekenders in Townsend's possession, Townsend permitted Plaintiff to enter the female locker room with Brooks. (Compl. ¶¶ 35, 59.)

Once inside the female locker room, Brooks put on gloves and directed Plaintiff to remove her clothing for a strip search. (Compl. ¶ 36.)  Plaintiff explained that she was a nurse assigned to work at the Jail, but Brooks again directed her to remove her clothing. (Compl.

4

¶ 36.)  Plaintiff asked whether, as a nurse, she would have to submit to a strip search each day that she entered the facility and Brooks responded that she would.  (Compl. ¶ 37.)  Plaintiff asked if she could leave and contact her staffing agency, but Brooks repeated that once Plaintiff entered the Pre-Release Center she could not leave.  (Compl. ¶¶ 38-39.)  Brooks stated that Plaintiff's staffing agency should have warned her about the strip search requirement.  (Compl. ¶ 39.)

Brooks then directed Plaintiff to remove her pants.  (Compl. ¶ 40.)  When Plaintiff protested and refused, Brooks emphasized that Plaintiff had no choice.  (Compl. ¶ 40.)  Eventually, Plaintiff removed her pants and Brooks searched them, finding nothing.  (Compl. ¶ 41.)  Brooks then directed Plaintiff to remove her undergarments, which would leave Plaintiff completely naked.  (Compl. ¶ 42.)  Plaintiff again protested but eventually removed her bra and underwear.  (Compl. ¶ 43.)  Brooks then directed Plaintiff to "'squat and cough.'"  (Compl. ¶ 44.)  Brooks also directed Plaintiff to bend forward at her waist, spread her buttocks apart and cough while Brooks stood behind her, requiring Plaintiff to expose her anogenital area to Brooks.  (Compl. ¶ 46.)  After performing the strip search, Brooks returned Plaintiff's clothing and allowed Plaintiff to get dressed.  (Compl. ¶ 46.)

Following the strip search, Brooks escorted Plaintiff through a metal detector and patted down Plaintiff's legs.  (Compl. ¶ 47.)  Brooks then directed Plaintiff to sit down in the intake area.  (Compl. ¶ 47.)  Plaintiff waited unrestrained in the intake area for fifteen minutes before the coordinator of the Jail's Weekender program arrived at Townsend's request.  (Compl. ¶¶ 48-49.)  While waiting, Plaintiff overheard staff members discussing what she had just experienced, and several unidentified staff members apologized to her.  (Compl. ¶ 50.)

Approximately thirty minutes after Plaintiff entered the Pre-Release Center, a nurse with the Jail's medical contractor verified Plaintiff's work assignment.  (Compl. ¶ 51.)  Townsend

then returned Plaintiff's water bottle and a nurse directed Plaintiff back through the sally port

entrance and other secure doors and escorted her to the main building. (Compl. ¶ 53.) On her

way to the main building, Plaintiff encountered Brooks, who stated "'no wonder you have been

so confused throughout the whole process, they should have told us there would be a nurse

coming, we didn't know.'" (Compl. ¶ 54.)

Ultimately, Plaintiff completed her eight-week assignment at the Jail. (Compl. ¶ 56.)

However, Plaintiff's anxiety required her to arrive twenty minutes early to her remaining shifts

to afford herself enough time to control her anxiety. (Compl. ¶ 56.) Plaintiff's physicians also

diagnosed her with post-traumatic stress disorder ("PTSD") based on her experience at the Jail,

for which she continues to take prescribed medications and has been referred to counseling.

(Compl. ¶ 57.) Plaintiff's experience has also impacted her family life and ability to work,

putting a strain on her finances. (Compl. ¶ 57.)

### B.  Plaintiff's Complaint

On March 31, 2020, Plaintiff filed her Complaint (ECF No. 1) against Defendants,

raising eight counts for relief based on the above allegations. In Count One, Plaintiff alleges that

Defendants acted negligently by failing to ensure that only persons legally committed to the Jail

were subjected to the Jail's intake procedures, including a strip search. (Compl. ¶¶ 85-90.)

Relatedly, in Count Two, Plaintiff alleges that Defendants' conduct rose to the level of gross

negligence. (Compl. ¶¶ 91-96.) And, in Count Three, Plaintiff alleges that Townsend and

Brooks acted willfully and wantonly, entitling her to punitive damages. (Compl. ¶¶ 97-103.)

In Count Four, Plaintiff raises a false imprisonment claim against Townsend and Brooks,

alleging that both officers "used their power and authority" to hold Plaintiff in the intake area

and the female locker room without legal justification. (Compl. ¶¶ 104-12.) In Counts Five and

Six, Plaintiff raises intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED") claims against Townsend and Brooks, alleging that they knew or should have known that their conduct would result in Plaintiff suffering "severe emotional distress." (Compl. ¶¶ 113-23.)

Finally, in Counts Seven and Eight, Plaintiff raises claims under 42 U.S.C. § 1983, alleging that Townsend and Brooks, acting under color of state law, deprived Plaintiff of her constitutional rights by, in Count Seven, seizing her without legal justification and, in Count Eight, searching her without reasonable suspicion. (Compl. ¶¶ 124-34.)

Based on these claims, Plaintiff seeks relief from Townsend, Brown and Brooks in their individual capacities. (Compl. ¶¶ 14-16.) Plaintiff requests at least $1.5 million in compensatory damages, as well as punitive damages of at least $1 million for her federal claims and $350,000 for her state law claims. (Compl. at 28.)

### C.   Townsend's Motion to Dismiss

In response to Plaintiff's Complaint, on May 8, 2020, Townsend filed a Motion to Dismiss (ECF No. 14), moving to dismiss Plaintiff's claims as to him for lack of subject matter jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). In support of his Motion, Townsend argues that Plaintiff fails to plausibly allege that Townsend unreasonably searched or seized her in violation of her constitutional rights. (Mem. in Supp. of Mot. to Dismiss of Roy Townsend, Jr. ("Townsend Mem.") (ECF No. 15) at 7-12.) Specifically, Townsend contends that "Plaintiff's allegations . . . do not show any seizure by him at all, let alone an unreasonable seizure," because Plaintiff and Townsend engaged in a purely consensual encounter and Townsend did not act to restrain Plaintiff. (Townsend Mem. at 7-10.) And Townsend argues that Plaintiff fails to allege any involvement by him in the strip search,

7

requiring dismissal of Plaintiff's unreasonable search claim against him in Count Eight. (Townsend Mem. at 10-12.)

Alternatively, even assuming Plaintiff has plausibly alleged that he violated her constitutional rights, Townsend argues that qualified immunity shields him from suit under Plaintiff's § 1983 claims. (Townsend Mem. at 12-14.) Specifically, Townsend contends that it would not have been clear to a reasonable correctional officer in September 2019 that his actions violated Plaintiff's constitutional rights. (Townsend Mem. at 14.)

Addressing the remaining state law claims against him, Townsend argues that Counts One, Two and Three — the negligence counts — must fail, because Townsend "did not have an actionable duty to [Plaintiff] with respect to what she claims[, n]or did a breach by Officer Townsend of a duty to [Plaintiff] proximately cause the injury for which [Plaintiff] seeks redress." (Townsend Mem. at 15-16.) Townsend avers that the Jail's policies and protocols requiring him to ensure that only persons legally committed to the Jail are permitted to enter did not give rise to any private duty to Plaintiff. (Townsend Mem. at 16.) Townsend also maintains that he cannot be held liable for the actions of Officer Brooks inside the female locker room, because he played no direct role in Brooks's conduct, did not serve as Brooks's employer and cannot be held liable under Virginia law for negligent supervision. (Townsend Mem. at 17.) And Townsend contends that Plaintiff's claims for gross and willful and wanton negligence in Counts Two and Three amount to mere legal conclusions, for which Plaintiff's factual allegations provide no support. (Townsend Mem. at 18-19.)

As for Plaintiff's false imprisonment claim in Count Four, Townsend argues that Plaintiff again provides only conclusory allegations that fail to plausibly allege that Townsend restrained Plaintiff's liberty by force or threats. (Townsend Mem. at 20-21.) Townsend also contends that

8

Plaintiff's IIED claim must fail, because she fails to plausibly allege that Townsend acted so

outrageously that his conduct could be considered "'beyond all possible bounds of decency'" or

that he caused her to experience severe emotional distress.  (Townsend Mem. at 23 (quoting

*Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991) (internal quotations and citations omitted)).)

And Townsend avers that Plaintiff fails to allege the requisite physical injury to sustain her

NIED claim.  (Townsend Mem. at 24-25.)

Alternatively, Townsend argues that sovereign and qualified immunity shield him from

liability under Plaintiff's state law claims, because Townsend acted as an agent of the Authority,

which enjoys sovereign immunity, and because Virginia recognizes immunity for government

officials acting in good faith.  (Townsend Mem. at 27-28.)  Townsend also cites to the

exclusivity provision of the Virginia Workers' Compensation Act ("VWCA") as an additional

bar to Plaintiff's state law claims.  (Townsend Mem. at 28-29.)

Plaintiff filed her Memorandum in Opposition to Townsend's Motion to Dismiss on May

22, 2020, (Pl.'s Mem. in Opp. to Def. Townsend's Mot. to Dismiss ("Pl. Townsend Resp.")

(ECF No. 20)), and Townsend filed his Reply on May 28, 2020, (Reply Mem. in Supp. of Mot.

to Dismiss of Townsend ("Townsend Reply") (ECF No. 22)), rendering Townsend's Motion

now ripe for review.

### D.    Brown's Motion to Dismiss

Separately from Townsend, on May 9, 2020, Brown filed a Motion to Dismiss (ECF No.

16).  In support of his Motion, Brown reiterates Townsend's argument that the VWCA's

exclusivity provision bars Plaintiff's state law claims against him.  (Mem. in Supp. of Def.

Brown's Mot. to Dismiss ("Brown Mem.") (ECF No. 17) at 1, 5-8.)  Like Townsend, Brown also

argues that the Authority's sovereign immunity as a political subdivision extends to him as the

Authority's agent acting in his official capacity, precluding Plaintiff's claims. (Brown Mem. at 2, 8-9.) And in any case, Brown contends that Plaintiff's negligence and gross negligence claims in Counts One and Two — the only claims against him — must fail, because he neither owed a duty to Plaintiff nor could foresee the conduct that harmed her. (Brown Mem. at 2, 10-12.) Rather, Brown characterizes his conduct as "acts of common courtesy" that cannot sustain negligence or gross negligence claims. (Brown Mem. at 2, 13-14.)

Plaintiff filed her Memorandum in Opposition to Brown's Motion to Dismiss on May 26, 2020, (Pl.'s Mem. in Opp. to Def. Brown's Mot. to Dismiss ("Pl. Brown Resp.") (ECF No. 21)), and Brown filed his Reply on June 1, 2020, (Def. Brown's Reply in Supp. of Mot. to Dismiss (ECF No. 23)), rendering Brown's Motion now ripe for review.

## II.   STANDARD OF REVIEW

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint. A defendant moving for dismissal for lack of subject matter jurisdiction may either attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or, as here, may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co., Inc.*, 947 F. Supp. 231, 233 (E.D. Va. 1996) (internal citations omitted). In either case, the plaintiff bears the burden of proof to establish jurisdiction. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991). The Court must dismiss an action if it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

By comparison, a motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests

surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

## III.   ANALYSIS

Both Townsend and Brown raise arguments related to the Court's jurisdiction over Plaintiff's Complaint, namely that: (1) the VWCA's exclusivity provision bars Plaintiff's state law claims; (2) the Authority's sovereign immunity extends to them as agents acting in the scope

of their employment; and, (3) Townsend enjoys qualified and good faith immunity from suit under both federal and state law.  (Townsend Mem. at 12-14, 27-29; Brown Mem. at 5-9.) Because these jurisdictional arguments determine the Court's authority to decide the merits of Plaintiff's claims, the Court will address those arguments first.  Only if the Court can exercise jurisdiction over Plaintiff's claims will the Court address Townsend and Brown's remaining arguments regarding Plaintiff's failure to state a claim.

### A.     The VWCA's Exclusivity Provision Does Not Bar Plaintiff's Claims.

As mentioned, both Townsend and Brown argue that the VWCA's exclusivity provision bars Plaintiff's claims, because as an employee of the Authority working in the scope of her employment at the time of her alleged injuries, Plaintiff must rely exclusively on a workers' compensation claim to obtain any relief.  (Townsend Mem. at 27-29; Brown Mem. at 5-8.) Plaintiff concedes that the Authority constituted her statutory employer under the VWCA; however, Plaintiff contends that her alleged injuries neither resulted from an accident arising out of her employment nor occurred in the course of her employment within the meaning of the Act, rendering the exclusivity provision inapplicable to her claims.  (Pl. Townsend Resp. at 25-30; Pl. Brown Resp. at 6-14.)

Because Plaintiff's state law claims invoke the Court's diversity and supplemental jurisdiction, in ruling on those claims, the Court must apply the substantive law of the state in which it sits, including its choice-of-law rules.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Here, no party disputes that Virginia law, including the VWCA, governs Plaintiff's state law claims.  Under the VWCA, any payments or compensation made to an employee of a statutory employer pursuant to the Act "on account of injury or death by accident shall exclude all other rights and remedies of such employee . . . at common law or otherwise, on

12

account of such injury, loss of service or death." Va. Code § 65.2-307(A). This so-called

exclusivity provision acts to bar "all other rights and remedies of an employee or his estate at

common law or otherwise" against the employee's statutory employer(s). *Clean Sweep*

*Professional Parking Lot Maintenance, Inc. v. Talley*, 591 S.E.2d 79, 81 (Va. 2004) (citing *Peck*

*v. Safway Steel Prods., Inc.*, 551 S.E.2d 328, 329 (Va. 2001)). Relevant here, the exclusivity

provision also bars similar claims against an injured employee's statutory co-employees. *See*

*David White Crane Serv. v. Howell*, 714 S.E.2d 572, 576 (Va. 2011) (noting that "[a]lthough

statutory co-employees are not the injured worker's statutory employers, and are therefore not

liable for the payment of workers' compensation benefits to him, they come within the canopy of

the Act").

However, the VWCA's exclusivity provision applies only insofar as the Act itself covers

an employee's injuries. *Butler v. Southern States Co-op, Inc.*, 620 S.E.2d 768, 772 (Va. 2005).

Therefore, the exclusivity provision will not bar a plaintiff's claims if the plaintiff can

demonstrate that such claims fall outside the coverage of the VWCA. In other words, to avoid

the exclusivity provision, a plaintiff must demonstrate that she did not sustain an "injury by

accident" that "arose out of" and occurred "in the course of" her employment for a statutory

employer. *Snead v. Harbaugh*, 404 S.E.2d 53, 55 (Va. 1991). Because Plaintiff concedes that

the Authority constituted her statutory employer at the time of her alleged injuries, the relevant

inquiry becomes whether Plaintiff's allegations describe (1) an "injury by accident" that (2) both

(a) arose out of and (b) occurred in the course of Plaintiff's employment for the Authority. If

Plaintiff fails to plausibly allege otherwise, the VWCA covers her injuries and the Act's exclusivity provision bars her state law claims.[3]

### 1.   Plaintiff Fails to Allege that Her Injuries Did Not Result from an "Accident" Within the Meaning of the VWCA.

The Virginia Supreme Court has defined "injury by accident" as "those injuries resulting from an identifiable incident that results in a sudden mechanical or structural change in the body." *Lichtman v. Knouf*, 445 S.E.2d 114, 115 (Va. 1994). By this definition, an injury sustained from "cumulative repetitive action" does not constitute an injury by accident. *Id.* (citations omitted). Similarly, "emotional distress alleged by a plaintiff to have been . . . gradually incurred as the result of repetitive trauma" falls beyond the VWCA's coverage. *Id.* (citations omitted). Neither does the Act compensate non-personal injuries, such as damage to one's reputation. *Harbaugh*, 404 S.E.2d at 55. However, emotional injuries, including PTSD, may be compensated under the Act "provided that circumstances show an 'identifiable incident [occurring] at a reasonably definite time' which causes the emotional injury." *Hercules, Inc. v. Gunther*, 412 S.E.2d 185, 189 (Va. App. 1991). Notably, the Virginia Supreme Court has defined "injury by accident" to include injuries resulting from intentional torts, reasoning that whether an injury proves accidental revolves around whether the injury "is unusual and not expected by the person to whom it happens," not the intention of the tortfeasor. *Haddon v. Metro. Life Ins. Co.*, 389 S.E.2d 712, 713-14 (Va. 1990).

---

[3]      Notably, the exclusivity provision does not bar Plaintiff's § 1983 claims against Townsend. *See Adams Fruit Co. v. Barrett*, 494 U.S. 638, 646-48 (1990) (instructing that federal courts "should [not] assume that Congress has conditioned [a private right of action to vindicate a federal right] on the unavailability of a state remedy" and holding that states cannot "withdraw federal remedies by establishing state remedies as exclusive"); *Mizenko v. Elec. Motor & Contracting Co.*, 419 S.E.2d 637, 642 (Va. 1992) (recognizing that the exclusivity provision of the VWCA cannot be applied to deprive plaintiffs of a substantive federal right, at least when the federal interest at stake outweighs the state interest).

With these principles in mind, Plaintiff argues that her injuries do not fit the definition of an "injury by accident," because they resulted from the "combined trauma" of Defendants' actions, not a single, discrete event. (Pl. Brown Resp. at 7.) Although Plaintiff concedes that the actions giving rise to her injury occurred within a discrete period — approximately thirty minutes — she nonetheless avers that her experience "can be properly considered repetitive trauma." (Pl. Brown Resp. at 7.)

Indeed, in *Aistrop v. Blue Diamond Coal Company*, the Virginia Supreme Court held that injuries sustained from "the cumulative effect of many acts done or many exposures to conditions prevalent in the work[place], none of which can be identified as the cause of the harm, is definitely excluded from compensation [under the VWCA]." 24 S.E.2d 546, 548 (Va. 1943) (internal quotations and citations omitted). Therefore, "injury by accident" requires that the alleged injury result from an event "which can be fixed with reasonable certainty," *id.* at 549, such that the injurious event is "bounded with rigid temporal precision," *Morris v. Morris*, 385 S.E.2d 858, 864 (Va. 1989).

However, the "rigid temporal precision" requirement does not mean that an incident lasting more than a few seconds or minutes automatically renders a resulting injury non-compensable. *See, e.g., Southern Exp. v. Green*, 509 S.E.2d 836, 841 (Va. 1999) (holding that chilblains resulting from four-hour period inside a freezer constituted an "injury by accident," because they "were the result of some particular piece of work done or condition encountered on a definite occasion" (internal quotations and citations omitted)). Likewise, an injury remains compensable even though it results from more than one action or event within a discrete time period. *Van Buren v. Augusta Cnty.*, 787 S.E.2d 532, 538 (Va. App. 2016) (citations omitted).

15

Thus, the determinative question becomes whether an injury can be fairly traced to a reasonably precise period of time. *Id.*

Based on these holdings, the Court finds that Plaintiff's alleged injuries constitute an "injury by accident" within the meaning of the VWCA. Although Plaintiff points to several injurious actions by Defendants, her resulting injuries — namely, her PTSD and anxiety — can be fairly traced to a discrete and temporally precise period of time (i.e., thirty minutes). Indeed, Plaintiff alleges that the events occurring during the thirty-minute period in question have been medically documented as the cause of her PTSD and associated anxiety. (Compl. ¶ 56.) Therefore, Plaintiff's injuries resulted from an incident of "reasonable temporal precision," even though multiple successive actions within that precise period contributed to her injuries.

### 2.   *Plaintiff's Allegations, Taken as True, Support the Inference that Her Injuries Did Not Arise Out of Her Employment.*

The question then becomes whether Plaintiff's alleged injuries "arose out of" and occurred "in the course of" Plaintiff's employment. As to the first point, Townsend and Brown contend that Plaintiff's alleged injuries arose out of her employment, because her employment and not her status as an ordinary civilian required her to enter the Jail and risk being exposed to the intake procedures, even if Plaintiff could not foresee or expect what happened. (Brown Mem. at 7; Townsend Reply at 12-13.) Plaintiff responds that her alleged injuries did not arise out of her employment, because "[t]here is no causal connection here between the conditions under which [Plaintiff] was required to work and her injuries . . . [and Plaintiff's] injuries did not flow from her employment as a rational consequence." (Pl. Townsend Resp. at 28 (emphasis removed) (internal quotations and citations omitted).)

In Virginia, to "arise out of" an employee's employment, the "causative danger [must] be peculiar to the work and not common to the neighborhood." *Hill City Trucking v. Christian*, 385

16

S.E.2d 377, 380 (Va. 1989).  This so-called "actual risk" standard "excludes an injury which comes from a hazard to which the employee would have been equally exposed apart from the employment." *Taylor v. Mobil Corp.*, 444 S.E.2d 705, 708 (Va. 1994) (internal quotations and citations omitted).  Importantly, an "actual risk of employment" is "not merely the risk of being injured while at work." *Id.*  That an injury occurs at work "adds nothing and answers nothing, when the inquiry is, did the injury arise out of the employment." *Cnty. of Chesterfield v. Johnson*, 376 S.E.2d 73, 76 (Va. 1989).  Rather, courts must ask whether a plaintiff's injuries "can be fairly traced to [her] employment as a contributing proximate cause." *Simms v. Ruby Tuesday, Inc.*, 704 S.E.2d 359, 363 (Va. 2011).  Although the injury "need not have been foreseen or expected, . . . after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence." *Id.*

On the facts alleged, being subjected to the same intake procedures as inmates serving weekend-only sentences did not constitute a risk peculiar to Plaintiff's employment.  To be sure, Plaintiff would not have attempted to enter the Jail on the day in question but for her employment; however, there exists no rational causal connection between Plaintiff's employment and her exposure to the risk of being subjected to inmate intake procedures.  *See City of Rich. v. Braxton*, 335 S.E.2d 259, 261 (Va. 1985) (noting that to obtain coverage under the VWCA, "[i]t is not sufficient to find that the employment is what brought the parties into close proximity" and holding that assaults against employees must be "against the employee as part of the employment relationship" (internal quotations and citations omitted)).  In fact, Plaintiff's employment should have allowed her to avoid the exact hazards that caused her alleged injuries — a fact around which Plaintiff centers her entire Complaint.  Put differently, although Plaintiff's employment required her to enter the Jail and expose herself to the risks

17

attendant thereto, her employment did not, by either policy or circumstance, require her to enter

the Pre-Release Center or submit to the Jail's highly intrusive inmate-only intake procedures.

Rather, Defendants' apparent error in believing that Plaintiff was an inmate and *not an employee*

resulted in her exposure to the hazards in question, all but foreclosing the possibility that

Plaintiff's injuries arose out of the conditions of her employment. *See Baggett Transp. Co. v.*

*Dillon*, 248 S.E.2d 819, 825 (Va. 1978) (considering claim by the estate of a truck driver shot by

a sniper while waiting outside his work truck at a rest stop and holding that the driver's death did

not arise out of his employment, because "[t]here is no indication that the gun was aimed at him

because of his work as a truck driver").

Because Plaintiff's allegations, taken as true, bring her alleged injuries outside the

coverage of the VWCA, the VWCA's exclusivity provision does not bar Plaintiff's state law

claims at this stage.[4]

### B. Sovereign Immunity Protects Townsend, Brown and Brooks from Liability Under Only Counts One and Six.

Townsend and Brown argue that the Authority's sovereign immunity extends to them as

agents acting in the scope of their employment for the Authority and therefore precludes

Plaintiff's state law claims against them. (Townsend Mem. at 27-28; Brown Mem. at 8-9.)

Plaintiff responds that although Townsend and Brown share the same sovereign immunity as the

Authority, such immunity shields Townsend and Brown only against claims based on simple

---

[4]      Because Plaintiff has successfully alleged facts to avoid the VWCA's coverage under the
"arose out of" prong of the compensability test, the Court need not address the "in the course of"
prong. *See Johnson*, 376 S.E.2d at 74 (noting that the "arising out of" and "in the course of"
prongs "are separate and distinct" and that coverage under the VWCA does not exist when a
claimant cannot prove either).

negligence, preserving her claims based on grossly negligent, willful and wanton, and intentional conduct. (Pl. Townsend Resp. at 21-22; Pl. Brown Resp. at 14.) The Court agrees with Plaintiff.

Indeed, under Virginia law, "[i]f an individual working for an immune governmental entity is entitled to the protection of sovereign immunity under the common law, he is not immunized from suit. Rather, the degree of negligence which must be shown to impose liability is elevated from simple to gross negligence." *Burns v. Gagon*, 727 S.E.2d 634, 646 (Va. 2012) (citations omitted). In the same vein, sovereign immunity does not protect government officials from liability under Virginia law for intentional torts, "irrespective of whether they acted within or without the scope of their employment." *Fox v. Deese*, 362 S.E.2d 699, 706 (Va. 1987) (citing *Elder v. Holland*, 155 S.E.2d 369, 372-73 (Va. 1967)).

Here, because Plaintiff concedes that Townsend and Brown enjoy the same sovereign immunity as the Authority, sovereign immunity protects Townsend and Brown — and Brooks, for that matter — against any of Plaintiff's claims that are based on simple negligence.[5] Accordingly, the Court will dismiss Plaintiff's simple negligence claim in Count One as to all Defendants, including Brooks. Further, because Plaintiff's NIED claim in Count Six also relies on a finding that Townsend and Brooks acted only negligently, the Court will likewise dismiss that count as to all Defendants. (*See* Compl. ¶ 121 (alleging only that Defendants' "negligence" caused Plaintiff's emotional distress)); *see also Shaw v. Stroud*, 13 F.3d 791, 803 (4th Cir. 1994) ("A [NIED] claim, by its very definition, necessarily alleges only negligence."); *Rollins v. Consolidated Bank & Tr. Co.*, 2000 WL 33595047, at *2 (Va. Cir. Ct. Rich. Oct. 24, 2000)

---

[5]     Although Brooks has not filed any responsive pleadings or motions, the Courts finds no distinguishing facts between Brooks's role as an agent of the Authority and the roles held by Townsend and Brown. Therefore, Brooks enjoys the same sovereign immunity as Townsend and Brown.

(dismissing NIED claim based on sovereign immunity).  However, assuming that Plaintiff has alleged sufficient facts to support her remaining state law claims (Counts Two, Three, Four and Five), all of which require proof of wrongdoing greater than simple negligence, sovereign immunity will not shield Townsend, Brown or Brooks from liability under those claims.

**C.    Townsend Fails to Carry His Burden to Claim Qualified Immunity Under State Law.**

Townsend contends — albeit briefly and without explanation — that the state law claims against him should be dismissed under Virginia's doctrine of qualified, or good faith, immunity, which resembles the federal doctrine of qualified immunity.  (Townsend Mem. at 28.)  Plaintiff responds that Townsend has failed to carry his burden to claim qualified immunity under state law and that such immunity should not shield him in this instance, because Townsend did not make a reasonable mistake of fact or law.  (Pl. Townsend Resp. at 24-25.)

The Court agrees with Plaintiff that Townsend has not properly carried his burden to claim Virginia's qualified immunity defense at this stage.  As the Supreme Court of Virginia opined in *Jordan v. Shands*, "[a] defendant who asserts the qualified immunity defense, not the plaintiff, must allege and prove the elements comprising this defense." 500 S.E.2d 215, 219 (Va. 1998).  Importantly, a defendant "may not . . . shift his pleading and proof burdens to the plaintiff." *Id.*  Here, Townsend raises Virginia's qualified immunity defense in only one paragraph and fails to mention it again in his Reply.  (Townsend Mem. at 28.)  Townsend also fails to cite to any evidence or allegations that demonstrate his entitlement to immunity under state law.  Instead, Townsend attempts to shift the burden to Plaintiff to argue why the defense should not apply.  Accordingly, Townsend has failed to satisfy his burden and he may not rely on Virginia's qualified immunity defense at this stage.

**D.     Qualified Immunity Does Not Shield Townsend From Further Suit Under Plaintiff's § 1983 Claims.**

Townsend also argues that the federal doctrine of qualified immunity shields him from suit under Plaintiff's § 1983 claims, because Plaintiff fails to plausibly allege a violation of her constitutional rights. (Townsend Mem. at 7-12.) And even if Plaintiff has sufficiently alleged a violation of her rights, Townsend contends that such rights were not clearly established at the time of the violation such that he may rely on qualified immunity. (Townsend Mem. at 12-14.) Plaintiff responds that she has plausibly alleged a violation of her Fourth Amendment rights to be free from unreasonable searches and seizures and that both rights were clearly established at the time of Townsend's alleged conduct. (Pl. Townsend Resp. at 7-13.)

To determine whether qualified immunity shields a government official from suit, the Supreme Court has established a two-step inquiry in which courts must determine: (1) "whether the facts that a plaintiff has alleged [if resolved on a motion to dismiss] or shown [if resolved on a motion for summary judgment] make out a violation of a constitutional right;" and, (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Although the Supreme Court previously mandated that courts follow these steps in sequential order, in *Pearson*, the Court held that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Id.* at 236. Thus, "judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.* For example, courts may start with the second prong in cases "in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* at 237.

21

Here, Plaintiff alleges two violations of her constitutional rights, namely: (1) in Count

Seven, that Townsend and Brooks unreasonably seized her by preventing her from leaving the

female locker room and keeping her in the intake area after the strip search; and, (2) in Count

Eight, that Townsend and Brooks subjected her to a strip search without legal justification.

(Compl. ¶¶ 126, 132.) Both claims rely on the Fourth Amendment, as incorporated on the States

by the Fourteenth Amendment, which explicitly protects the "right of the people . . . against

unreasonable searches and seizures." U.S. Const. amend. IV. Therefore, the Court must ask:

(1) whether Plaintiff plausibly alleges that Townsend seized and searched her; (2) if so, whether

the seizure and search of Plaintiff proved unreasonable; and, (3) if Townsend unreasonably

seized and searched Plaintiff, whether the state of the law in September 2019 put Townsend on

fair notice that his conduct violated Plaintiff's rights. The Court will address each question in

turn.

### 1.    *Plaintiff Sufficiently Alleges that Townsend Seized and Searched Her.*

A "seizure" occurs "when, taking into account all of the circumstances surrounding the

encounter, the [correctional officer's] conduct would have communicated to a reasonable person

that he was not at liberty to ignore the [officer's] presence and go about his business." *Kaupp v.

Texas*, 538 U.S. 626, 629 (2003) (per curiam) (citations omitted).

Based on this standard, Townsend argues that he did not seize Plaintiff, because he "did

not compel — nor even request — that [P]laintiff come into the Jail's Intake Area where he was

on duty" and did not require Plaintiff to remain in the intake area. (Townsend Mem. at 7-8.)

Instead, Townsend characterizes his encounter with Plaintiff as "consensual." (Townsend Mem.

at 8.) Plaintiff responds that although her encounter with Townsend began as a consensual

encounter, it became a Fourth Amendment seizure when "Townsend and Brooks decided that

[Plaintiff] would be taken into the locker room and strip searched." (Pl. Townsend Resp. at 12.)
After that point, Plaintiff maintains that the totality of the circumstances communicated that she
could not leave the locker room or intake area. (Pl. Townsend Resp. at 12.)  The Court agrees
with Plaintiff.

For one, Plaintiff alleges that she entered the Pre-Release Center on her first day after
becoming lost on the Jail complex and asking Brown for directions. (Compl. ¶¶ 18-21.)  Plaintiff
did not know that she had been directed to the wrong building and entered the Center through the
secure sally port entrance used by inmates. (Compl. ¶ 21.)  Notably, Plaintiff could not open the
sally port entrance without the assistance of a correctional officer. (Compl. ¶ 22.)

That day, Townsend served as the officer on duty inside the Pre-Release Center. (Compl.
¶ 24.)  Townsend opened a second secure door and permitted Plaintiff to enter the Center's
intake area. (Compl. ¶ 26.)  Once inside, Plaintiff informed Townsend about her work
assignment at the Jail. (Compl. ¶ 27.)  Nonetheless, Townsend directed Plaintiff to take a seat.
(Compl. ¶ 28.)  After Brooks entered the intake area, she spoke with Townsend and the two
officers pointed at Plaintiff while talking. (Compl. ¶ 29.)  Brooks then directed Plaintiff to
follow her into the female locker room. (Compl. ¶ 30.)  Plaintiff attempted to take her lunch and
water bottle with her, but Brooks told her she could not bring those items into the locker room.
(Compl. ¶ 31.)  Brooks also told Plaintiff that she could not return those items to her car, stating
that once Plaintiff entered the Center should could not leave. (Compl. ¶ 31.)  After Plaintiff
asked Townsend if he could hold on to her lunch and water bottle, Townsend stated that Plaintiff
had to throw away her lunch, though he agreed to hold on to Plaintiff's water bottle. (Compl.

¶¶ 32, 34.)  Following the strip search, Townsend retained possession of Plaintiff's water bottle while Brooks escorted Plaintiff through the metal detectors and patted her down, until finally other employees at the Jail confirmed Plaintiff's employment status.  (Compl. ¶¶ 47-52.)

Although at first Plaintiff's allegations suggest only a consensual encounter between her and Townsend, Plaintiff's allegations support the plausible inference that Townsend coordinated with Brooks for Plaintiff to be taken to the female locker room for a strip search, at which point the consensual encounter became a Fourth Amendment seizure.  Therefore, Townsend did not merely supervise or otherwise vicariously participate in the seizure of Plaintiff; he acted directly to effectuate the seizure.  Indeed, Brooks explicitly told Plaintiff that she could not leave the Center in Townsend's presence, and Townsend confirmed that instruction by directing Plaintiff to throw away her lunch.  Townsend then continued to participate in Plaintiff's seizure by holding on to her water bottle while Plaintiff waited in the intake area after being told she could not leave.

In arguing that Plaintiff fails to allege a seizure, Townsend cites to the Fourth Circuit's decision in *Monroe v. City of Charlottesville*, in which the Fourth Circuit affirmed the district court's dismissal of the plaintiff's unreasonable seizure claim after finding that the plaintiff failed to allege that a seizure occurred.  579 F.3d 380, 386-87 (4th Cir. 2009).  However, *Monroe* proves distinguishable from this case, because there the plaintiff alleged only that he subjectively believed that the relevant encounter with police officers constituted a seizure and otherwise alleged only conclusively that he had been "coerced."  *Id.*  On the other hand, here, Plaintiff alleges objective facts about the surrounding circumstances of her encounter with Townsend, as well as about Townsend's own actions, to support the plausible inference that a reasonable person in the same situation would have believed that they could not leave.  Accordingly,

24

Plaintiff has sufficiently alleged that Townsend seized her within the meaning of the Fourth Amendment.

As for whether Townsend searched Plaintiff, Townsend contends that he did not search Plaintiff, because he did not directly participate in Plaintiff's strip search. (Townsend Mem. at 10-12.) However, Townsend ignores that § 1983 "imposes liability not only for conduct that directly violates a right but for conduct that is the effective cause of another's direct infliction of the constitutional injury." *Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998). Therefore, "'[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Id.* (quoting *Gutierrez-Rodriguez v. Cartegena*, 882 F.2d 553, 560-61 (1st Cir. 1989)).

Under this so-called "effective causation" theory, Plaintiff has alleged sufficient facts to establish that Townsend searched her. Specifically, Plaintiff alleges that Townsend worked as the intake officer for the Center on the day in question, charged with handling the intake of inmates serving weekend-only sentences. (Compl. ¶¶ 21, 24.) Plaintiff identified herself to Townsend as a nurse employed by the Jail's healthcare contractor, an assertion that Townsend did not investigate before Plaintiff entered the female locker room. (Compl. ¶¶ 27-28.) Plaintiff also alleges that Townsend possessed a list of Weekender inmates that did not include Plaintiff's name. (Compl. ¶ 35.) And Plaintiff further alleges that Brooks entered the intake area and spoke to Townsend before Brooks directed Plaintiff to follow her into the female locker room. (Compl. ¶¶ 29-30.) Importantly, Townsend and Brooks pointed at Plaintiff while they spoke, suggesting that they were speaking about her. (Compl. ¶ 29.)

Together, these facts support the plausible inference that Townsend effectively caused the search of Plaintiff. For one, Townsend's position as the intake officer on the day in question and his possession of information that could confirm Plaintiff's status as a Weekender provided him with the authority and ability to prevent Plaintiff's mistaken subjection to the Jail's intake procedures, thereby placing Townsend directly in the line of causation between Plaintiff's arrival at the Center and the search of her person. Townsend also appeared to speak with Brooks about Plaintiff before Plaintiff underwent the strip search, which supports the plausible inference that Townsend directed or coordinated with Brooks to strip search Plaintiff.[6] Indeed, on the facts alleged, Brooks did not enter the intake area until after Plaintiff had entered, so Brooks could not have formed her own conclusion that Plaintiff was an inmate until speaking with Townsend. Therefore, Townsend did not merely passively observe the alleged deprivation of Plaintiff's rights, but effectively caused the alleged deprivation to occur.

### 2.   *Plaintiff Has Plausibly Alleged That Townsend Unreasonably Seized and Searched Her.*

The question then becomes whether Plaintiff has plausibly alleged that Townsend acted unreasonably in causing her search and seizure. Ordinarily, whether a seizure proves unreasonable requires "an objective assessment of the officer's actions in light of the facts and

---

[6]   In his Memorandum in Support, Townsend cites to the opinion of Senior United States District Judge Henry E. Hudson in *Raub v. Campbell*, in which Judge Hudson found the plaintiff's allegation that one of the defendants directed the other to arrest the plaintiff proved insufficient to state a claim against the first defendant, in part, because the plaintiff alleged only that a phone conversation occurred and failed to allege the contents of that conversation. 2014 WL 130974, at *3 (E.D. Va. Jan. 14, 2014). However, Plaintiff's allegations here prove distinguishable, because although she does not allege the specific content of Townsend's discussion with Brooks, she alleges context clues — e.g., Townsend's position as the intake officer, Townsend and Brooks pointing at her, Brooks not asking Plaintiff to follow her to the female locker room until after the conversation — that support the plausible inference that Townsend effectively caused the strip search.

circumstances confronting him at the time, and not the officer's actual state of mind at the time

the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985). Likewise,

because "a prison employee . . . does not forfeit all privacy rights when she accepts

employment," for a "visual body cavity search" of a prison employee to be reasonable, prison

officials must possess "a reasonable and individualized suspicion that an employee is hiding

contraband on his or her person." *Leverette v. Bell*, 247 F.3d 160, 167-68 (4th Cir. 2001); *see

also Braun v. Maynard*, 652 F.3d 557, 558 (4th Cir. 2011) (acknowledging that a prison

employee's right to be free from intrusive searches without reasonable and individualized

suspicion constitutes a "clearly established" right).

However, Plaintiff's claims do not fit squarely within the mold of the standard prison

employee case. Indeed, Plaintiff's allegations support the plausible inference that Townsend and

Brooks mistakenly believed that Plaintiff was an inmate, whom Townsend and Brooks could

subject to the Jail's intake procedures without violating the Constitution. This mistaken belief in

Plaintiff's inmate status proves analogous to the facts in *Baker v. McCollan*, in which the

Supreme Court held that the arrest and detention of a mistakenly identified individual pursuant to

a facially valid warrant does not establish a violation of the Fourteenth Amendment's Due

Process Clause, because "[t]he Constitution does not guarantee that only the guilty will be

arrested" or require law enforcement officials "to investigate independently every claim of

innocence." 443 U.S. 137, 145-46 (1979). That said, *Baker* left open the question of whether

government officials violate an individual's Fourth Amendment rights when they seize or search

that individual based on a mistaken identity.

Notably, the Fourth Circuit has approached this open question by combining the

reasonableness of an official's mistaken identity with the analysis of the reasonableness of the

search or seizure itself. For example, in *Brown v. Wiita*, the Fourth Circuit considered a § 1983

claim alleging that officers violated the plaintiff's Fourth Amendment rights by arresting the

plaintiff on the mistaken belief that he was an individual named in an indictment. 7 F. App'x

275, 276-77 (4th Cir. 2001). On appeal, the Fourth Circuit considered whether the arresting

officer could claim qualified immunity. *Id.* at 278. In concluding that the officer could, the

Fourth Circuit found that the arresting officer's mistaken identification of the plaintiff proved

reasonable under the circumstances, rendering the arrest of the plaintiff reasonable as well. *Id.* at

278-79; *see also Hill v. California*, 401 U.S. 797, 802-03 (1971) (finding a mistaken identity

arrest justified, because the officers had probable cause to arrest the correct individual and the

circumstances presented rendered the officers' mistaken identification reasonable). The Court

finds the same approach appropriate here. Therefore, whether Townsend violated Plaintiff's

Fourth Amendment rights turns on whether Townsend reasonably believed that Plaintiff was an

inmate in light of the facts and circumstances confronting him at the time.

    To that end, at this stage, the Court finds that Plaintiff has alleged sufficient facts to

support the plausible inference that Townsend unreasonably believed that Plaintiff was an

inmate. Specifically, Plaintiff alleges that Townsend possessed a list of all of the Weekender

inmates that did not include Plaintiff's name. (Compl. ¶ 35.) She also alleges that she

personally notified Townsend that she was an employee, and her appearance and behavior

corroborated her claims. (Compl. ¶¶ 27-28.) Together, these allegations support the plausible

inference that Townsend's mistaken belief proved unreasonable.

    In any case, the ultimate question of whether Townsend reasonably believed that Plaintiff

was an inmate proves better suited for summary judgment or trial, when the facts and

circumstances facing Townsend can be fully presented.  For now, the Court finds that Plaintiff has alleged a plausible violation of her Fourth Amendment rights.

### 3.    *The Rights Allegedly Violated by Townsend Were "Clearly Established" in September 2019.*

Because Plaintiff has alleged that Townsend plausibly violated her Fourth Amendment rights, the Court must consider whether the rights plausibly violated by Townsend were "clearly established" in September 2019, when the alleged violations occurred.  "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations, alterations and citations omitted).  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).  The "clearly established" standard balances a plaintiff's interest in vindicating her constitutional rights with the interest of government officials in "reasonably . . . anticipat[ing] when their conduct may give rise to liability for damages." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).  Accordingly, "the right allegedly violated must be established not as a broad general proposition, but in a particularized sense so that the contours of the right are clear to a reasonable official." *Reichle*, 566 U.S. at 665 (internal quotations and citations omitted).

To be sure, qualified immunity does not require that "the very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002).  Indeed, the Supreme Court has held that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." *Anderson*, 483 U.S. at 640 (internal quotations and citations omitted).  Thus, "the salient question" becomes whether the state of the

law at the time of the alleged conduct "gave [the government official defendant(s)] fair warning that their alleged [conduct] was unconstitutional." *Hope*, 536 U.S. at 741.

At this stage, the Court will assume that it would be unreasonable under the circumstances alleged for a correctional officer to mistakenly identify Plaintiff as an inmate and not an employee; therefore, the rights plausibly violated by Townsend were the rights of prison employees not to be subjected to a strip search and its attendant seizure without reasonable and individualized suspicion of hidden contraband.  In 2011, the Fourth Circuit explicitly acknowledged that a prison employee's right to be free from "intrusive" searches without the requisite suspicion constitutes a "clearly established" right. *Braun*, 652 F.3d at 558.  It follows that if a correctional officer requires reasonable and individualized suspicion of hidden contraband to subject a prison employee to an intrusive search, the officer cannot seize an individual for the purposes of such a search without the same suspicion.  Thus, the rights allegedly violated by Townsend were both clearly established in September 2019.

Accordingly, because Plaintiff has plausibly alleged that Townsend unreasonably believed that she was an inmate, qualified immunity will not shield Townsend from further suit at this stage.  The Court therefore denies Townsend's Motion to Dismiss as to Counts Seven and Eight of Plaintiff's Complaint.

### E.    Plaintiff Plausibly Alleges Her Remaining State Law Claims Against Brown and Townsend.

Having addressed Defendants' jurisdictional challenges and merits of Plaintiff's § 1983 claims, the Court may now address the merits of Plaintiff's remaining state law claims, namely: (1) Plaintiff's gross negligence claim against Townsend, Brown and Brooks in Count Two; (2) Plaintiff's willful and wanton negligence claim against Townsend and Brooks in Count Three; (3) Plaintiff's false imprisonment claim against Townsend and Brooks in Count Four; and, (4)

Plaintiff's IIED claim against Townsend and Brooks in Count Five.  The Court will first address Plaintiff's remaining negligence claims before turning to her intentional tort claims.

### 1.    *Plaintiff States a Gross Negligence Claim Against Brown and Townsend and a Willful and Wanton Negligence Claim Against Townsend.*

Both Townsend and Brown argue that Plaintiff's gross and willful and wanton negligence claims must fail because neither officer owed any legal duty of care to Plaintiff.  (Townsend Mem. at 16; Brown Mem. at 10.)  Townsend and Brown maintain that although the Jail's internal policies and the Virginia Administrative Code require correctional officers to confirm the identity of all persons entering the Jail, such policies and regulations do not give rise to a private duty owed to Plaintiff.  (Townsend Mem. at 16; Brown Mem. at 11.)  And Townsend and Brown contend that despite Plaintiff's labeling of their conduct as grossly negligent or willful and wanton, Plaintiff's allegations instead demonstrate either at least slight diligence on the part of Townsend or mere common courtesy on the part of Brown.  (Townsend Mem. at 17-20; Brown Mem. at 13-14.)

Plaintiff responds that although Townsend and Brown did not owe a duty to her under the policies and regulations governing the Jail, they owed her a general duty of ordinary care based on their positions in relation to Plaintiff.  (Pl. Townsend Resp. at 20-21; Pl. Brown Resp. at 15.)  Plaintiff contends that Brown also assumed a duty of care by voluntarily assisting Plaintiff in navigating the Jail complex and escorting her into the Pre-Release Center.  (Pl. Brown Resp. at 17.)  Plaintiff argues that Townsend and Brown breached their respective duties and that their breach caused her injuries, establishing a negligence claim.  (Pl. Townsend Resp. at 21; Pl. Brown Resp. at 16-17.)

As for the degree of negligence committed by Townsend and Brown, Plaintiff contends that Townsend acted with gross and willful and wanton negligence, because he possessed a list

of Weekenders and knew that Plaintiff was not on that list but nonetheless caused Plaintiff to be

subjected to the inmate intake procedures, taking actions to correct his false assumption that

Plaintiff was an inmate only after Plaintiff had been subjected to a strip search.  (Pl. Townsend

Resp. at 23-24.)  And Plaintiff contends that Brown acted with gross negligence, because as the

primary control officer at the Jail on the day in question, only Brown controlled who entered

through the inmates' entrance to the Pre-Release Center and he allowed Plaintiff to enter the

Center despite indications that she was not an inmate.  (Pl. Brown Resp. at 19-23.)

### i.      *Townsend and Brown Owed a Duty of Ordinary Care to Plaintiff.*

The Court will first address the threshold issue of whether Townsend and Brown owed a

duty to Plaintiff.  Indeed, in Virginia, "[n]egligence . . . is not actionable unless there is a legal

duty, a violation of the duty, and consequent damages." *Burns v. Gagnon*, 727 S.E.2d 634, 641

(Va. 2012).  Both gross negligence and willful and wanton negligence claims likewise require

the existence of a legal duty.  *See Sisson v. Piedmont Reg'l Jail Auth.*, 2020 WL 1307858, at *5

(E.D. Va. Mar. 19, 2020) (recognizing willful and wanton negligence as a "level" of negligence

that, like other negligence claims, requires the existence of a legal duty); *Delaney v. Craighill*,

188 S.E.2d 78, 79 (Va. 1972) (holding that for a plaintiff "to recover [under a gross negligence

theory,] the defendant must have breached a duty owed [to the plaintiff] in such a manner and

under such circumstances as to constitute gross negligence").  Here, Plaintiff asserts that

Townsend and Brown owed her a duty of ordinary care at common law and that Brown also

assumed a duty to her when he agreed to assist her in navigating the Jail complex.  Accordingly,

the Court will cabin its analysis to whether Plaintiff has plausibly alleged the existence of those

duties.

As to the first duty asserted by Plaintiff — the duty of ordinary care — in Virginia, "[g]eneral negligence principles require a person to exercise due care to avoid injuring others." *RGR, LLC v. Settle*, 764 S.E.2d 8, 16 (Va. 2014). However, this duty does exist in the abstract; instead, "a specific course of conduct [must] give[] rise to a specific duty extending to specific circumstances." *Quisenberry v. Huntingdon Ingalls Inc.*, 818 S.E.2d 805, 810 (Va. 2018). As such, whether a duty of ordinary care exists depends on the relationship between the parties. *Id.* That said, "[t]he existence of [a] duty does not depend on proving a particular relationship," but "arises from the basic and necessary regulation of civilization which forbids any person because of his own convenience, to recklessly, heedlessly or carelessly injure another." *RGR*, 764 S.E.2d at 19 (internal quotations and citations omitted). For example, "[t]he motorist undertakes a duty to other nearby motorists and pedestrians — the class of persons which he places in a 'recognizable risk of harm' — to exercise due care in his conduct as he drives . . . despite the fact that the parties are complete strangers." *Quisenberry*, 818 S.E.2d at 810. Ultimately, "'[t]he only relationship which much exist [for a duty to arise] is a sufficient juxtaposition of the parties in time and space *to place the plaintiff in danger from the defendant's acts*.'" *Id.* at 811 (alterations and emphasis supplied) (quoting *RGR*, 764 S.E.2d at 19 (internal quotations and citations omitted)); *see also Overstreet v. Sec. Storage & Safe Deposit Co.*, 138 S.E. 552, 555 (Va. 1927) ("[W]henever the circumstances attending the situation are such that an ordinary prudent person could reasonably apprehend that, as a natural and probable consequence of his act, another person rightfully there will be in danger of receiving an injury, a duty to exercise ordinary care to prevent such injury arises.").

Based on these principles, the Court finds that both Townsend and Brown owed a duty of ordinary care to Plaintiff based on the "recognizable risk of harm" to Plaintiff that could result

from their actions or omissions. Indeed, as Plaintiff alleges, both Townsend and Brown occupied positions of authority that afforded them the sole discretion to determine whether Plaintiff would be exposed to the strip search that caused her alleged injuries. This relationship between Plaintiff — a non-inmate civilian seeking entry into the Jail — and both Townsend and Brown — correctional officers with control over who entered the Jail and under what preconditions — created a duty on the part of Townsend and Brown to prevent injury to Plaintiff from being subjected to inmate-only intake procedures. More importantly, as correctional officers familiar with the Jail's intake procedures and what they entailed, both Townsend and Brown could reasonably foresee the "natural and probable consequence" of their failure to properly ensure that only inmates underwent those procedures — that is, that Plaintiff would experience an intrusive and distressing search of her body. *Overstreet*, 138 S.E. at 555.

Notably, at least one Virginia court addressing similar facts has reached the same conclusion. Specifically, in *Calloway v. Commonwealth*, a Virginia circuit court considered a negligence claim brought against the Commonwealth of Virginia under the Virginia Tort Claims Act ("VTCA") by an adult visitor to a state prison whom officers required to undergo a strip search based on allegedly false pretenses. 2018 WL 9909950, at *1-2 (Va. Cir. Ct. Aug. 2, 2018). The Commonwealth argued, in part, that because the correctional officers did not owe a legal duty to the plaintiff, the Commonwealth could not be held liable under the VTCA, which waived the Commonwealth's sovereign immunity from suit only to the extent that private individuals in the same position would be liable. *Id.* at *10. In rejecting this argument, the circuit court held that the correctional officers in fact owed a duty of ordinary care to the plaintiff. *Id.* Likewise, a court in this District has found that a state official with control over the movement or treatment of individuals owes a common law duty of ordinary care to the class of

34

individuals subject to their control. *See Adams v. NaphCare, Inc.*, 246 F. Supp. 3d 1128, 1154-55 (E.D. Va. 2017) (Smith, C.J.) (finding that commissioner of state behavioral health agency with control over the movement of inmates in need of appropriate care owed a duty to decedent inmate who required such care). Undoubtedly, Townsend and Brown's alleged control over the movement and treatment of those individuals seeking entry to the Jail likewise gave rise to a duty of ordinary care to those same individuals, including Plaintiff.

### ii.   *Plaintiff Plausibly Alleges that Brown and Townsend Acted with Gross Negligence.*

The question then becomes whether Townsend and Brown breached their respective duties to Plaintiff with the requisite degree of indifference.[7] As mentioned, Plaintiff alleges that both Townsend and Brown acted with gross negligence toward her and that Townsend also acted willfully and wantonly. Gross negligence denotes "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004). Gross negligence "must be such a degree of negligence as would shock fair minded persons although something less than willful recklessness." *Ferguson v. Ferguson*, 181 S.E.2d 648, 653 (Va. 1971). Notably, "[w]hether or not gross negligence has been proved depends on the facts and circumstances of each case," and "[i]t is often a difficult task to determine whether the facts and the reasonable inferences therefrom in a given case do or do not show gross negligence as a

---

[7]      In his Reply, Townsend suggests that even if he owed a duty of ordinary care to Plaintiff, that would sustain only a simple negligence claim, against which he enjoys sovereign immunity from suit. (Townsend Reply at 18.) However, the Court finds no support for this contention in the caselaw. Indeed, courts have sustained gross and willful and wanton negligence claims based on the duty of ordinary care. *See, e.g., NaphCare, Inc.*, 246 F. Supp. 3d at 1156-57 (sustaining such claims against the defendant based on the duty of ordinary care). After all, the types of negligence merely describe degrees and kinds of inattention, which goes to breach, not the original duty owed. *Alspaugh v. Diggs*, 77 S.E.2d 362, 364 (Va. 1953).

matter of law." *Wallower v. Martin*, 144 S.E.2d 289, 292 (Va. 1965).  However, "a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016).

Based on these principles, the Court finds that Plaintiff has alleged sufficient facts to state a gross negligence claim against Townsend.  As to Townsend, Plaintiff alleges, and the Court accepts as true, that Townsend served as the intake officer at the Pre-Release Center on the day in question.  (Compl. ¶ 24.)  In this role, Townsend bore responsibility for ensuring that all individuals admitted as inmates had been legally committed to the Jail.  (Compl. ¶ 25.)  Despite this responsibility, without confirming Plaintiff's inmate status, Townsend opened a second secure door inside the Pre-Release Center and escorted Plaintiff into the inmate intake area. (Compl. ¶ 26.)  Once inside the intake area, Plaintiff identified herself as a nurse assigned to work at the Jail.  (Compl. ¶ 27.)  Nonetheless, even though Plaintiff wore nurse's scrubs and carried her lunch and a water bottle, and despite the fact that Townsend possessed a list of Weekenders against which he could corroborate Plaintiff's claims, Townsend asked Plaintiff to take a seat.  (Compl. ¶¶ 27-28, 35.)  Brooks then entered the intake area and spoke with Townsend while pointing at Plaintiff.  (Compl. ¶ 29.)  Following her conversation with Townsend, Brooks asked Plaintiff to follow her into the female locker room and required Plaintiff to undergo a strip search and other inmate intake procedures, despite Plaintiff's repeated protests and attempts to explain her reasons for being at the Jail.  (Compl. ¶¶ 30-47.)  Only after experiencing the strip search did Plaintiff learn that Townsend had called someone to confirm her inmate status.  (Compl. ¶¶ 48-49.)

Together, these facts support the plausible inference that Townsend acted with an "utter disregard of prudence" such that his conduct "would shock fair minded persons."  For one,

Plaintiff continued to identify herself as a nurse, not an inmate, and her appearance and the items

in her possession corroborated her account. In Townsend's presence, Plaintiff also behaved in a

distraught manner and protested Brooks's request that Plaintiff follow her to the female locker

room, which the Court reasonably infers would not be the typical behavior of someone who had

prepared to serve a weekend-only prison sentence. (*See* Compl. ¶¶ 31-32 (describing a

conversation between Plaintiff, Brooks and Townsend regarding whether Plaintiff could bring

her lunch into the Jail), 33 (alleging that Plaintiff shook "in fear" in front of Townsend and

Brooks before the strip search).) Critically, Townsend possessed an official list of Weekenders

that did not include Plaintiff's name. And although Townsend called a supervisor to confirm

Plaintiff's inmate status, he did not wait for that supervisor to arrive before allowing Brooks to

escort Plaintiff into the female locker room, where, by virtue of his position, Townsend knew

Plaintiff would undergo an intrusive strip search intended only for inmates. These allegations

and the inferences reasonably drawn from them describe a sufficient degree of indifference to

constitute gross negligence.

As for Brown's conduct, although Plaintiff's allegations do not draw as strong of an

inference in support of her gross negligence claim, at this stage, reasonable minds can differ as to

the degree of Brown's negligence, which proves sufficient to survive Brown's Motion to

Dismiss. As to Brown, Plaintiff alleges, and the Court accepts as true, that Plaintiff approached

Brown after becoming lost on her first day as a nurse assigned to the Jail. (Compl. ¶¶ 18-19.)

Plaintiff informed Brown about her work assignment and that she was looking for the orientation

with "Ms. Marshall." (Compl. ¶ 19.) Brown then pointed Plaintiff in the direction of the

appropriate parking lot and designated the building that she should enter and which entrance to

use. (Compl. ¶ 19.) Plaintiff wore nurse's scrubs and carried her wallet, water bottle and lunch

for the day. (Compl. ¶ 20.) Unbeknownst to Plaintiff, Brown had directed her to the building

and entrance used by Weekender inmates, through a secure door that only Brown could open.

(Compl. ¶¶ 21-22.) Before escorting Plaintiff through the secure door, Brown did not attempt to

confirm that Plaintiff was a Weekender inmate, despite the Jail's policies and procedures

requiring him to do so. (Compl. ¶ 23.)

These allegations support the plausible inference that Brown acted with complete neglect

for the safety and well-being of Plaintiff. Indeed, on the day in question, Brown served as the

primary control officer charged with controlling the movement of individuals seeking to enter

the Jail. (Compl. ¶ 7.) This authority came with a responsibility to ensure that those entering the

Jail entered the appropriate building. Brown neglected this responsibility by failing to confirm

that Plaintiff was a Weekender despite her statements regarding her purpose for being at the Jail

and her corroborating clothing. More importantly, Brown unlocked the secure sally port

entrance and escorted Plaintiff into the Pre-Release Center, which exposed Plaintiff to the harms

that she ultimately sustained. Indeed, Townsend and Brook's decisions flowed directly from

Brown's initial determination that Plaintiff was a Weekender and not an employee. Thus,

Plaintiff has shown that Brown behaved with sufficient heedlessness to constitute gross

negligence.

### iii. *Plaintiff States a Willful and Wanton Negligence Claim Against Townsend.*

As for Plaintiff's willful and wanton negligence claim against Townsend in Count Three,

to survive Townsend's Motion to Dismiss, Plaintiff must plausibly allege that Townsend acted

"consciously in disregard of another person's rights or . . . with reckless indifference to the

consequences, with the defendant aware, from his knowledge of existing circumstances and

conditions, that his conduct probably would cause injury to another." *Etherton v. Doe*, 597

S.E.2d 87, 90 (Va. 2004) (internal quotations and citations omitted).  As with gross negligence claims, "[e]ach case raising an issue of willful and wanton negligence must be evaluated on its own facts." *Kaltman v. All Am. Pest Ctrl., Inc.*, 706 S.E.2d 864, 871 (Va. 2011).

Based on these principles and the facts alleged, the Court finds that Plaintiff has stated a claim for willful and wanton negligence against Townsend.  Although Plaintiff's allegations do not show that Townsend acted with a conscious disregard for Plaintiff, the facts support the plausible inference that, based on "his knowledge of existing circumstances and conditions," Townsend acted with "reckless indifference" to the probability that subjecting Plaintiff to the inmate intake procedures without first confirming Plaintiff's status as an inmate would cause Plaintiff to suffer emotional harm.

Indeed, from Plaintiff's allegation that Townsend served as the intake officer at the Pre-Release Center, the Court can infer that Townsend knew what the inmate intake procedures entailed and the invasiveness of those procedures.  The Court can also infer Townsend's knowledge of the invasiveness of the inmate intake procedures from Plaintiff's allegation that a female officer, Brooks, conducted her strip search in a private locker room after a discussion with Townsend in which Townsend and Brooks pointed at Plaintiff as if they had been discussing her.  These allegations support the plausible inference that Townsend knew Brooks would subject Plaintiff to an intrusive strip search.

More importantly, Plaintiff alleges that Townsend possessed a list of Weekender inmates that did not include Plaintiff's name.  Plaintiff also told Townsend that she was not an inmate.  Therefore, Townsend both had notice that Plaintiff may have not been an inmate and a means by which to confirm Plaintiff's status.  Indeed, that Townsend later called a supervisor to confirm Plaintiff's inmate status supports the plausible inference that Townsend doubted whether

39

Plaintiff was an inmate. Nonetheless, despite his apparent doubt and without first waiting to confirm his assumptions, Townsend permitted Plaintiff to enter the female locker room for what he knew would be an intrusive strip search.

At this stage, the Court finds these allegations sufficient to state a willful and wanton negligence claim against Townsend. Accordingly, the Court denies Townsend's Motion to Dismiss as to Count Three.

### 2.   Plaintiff States a False Imprisonment Claim Against Townsend.

In Count Four of her Complaint, Plaintiff alleges that Townsend and Brooks falsely imprisoned her by using "their power and authority as Correctional Officers to first lead [Plaintiff] into the . . . Intake Area, then into the female locker room, and then did not allow her to leave despite multiple protestations." (Compl. ¶ 107.) Townsend contends that because Plaintiff does not allege that he personally prevented her from leaving the female locker room or intake area, Plaintiff cannot sustain her false imprisonment claim against him. (Townsend Mem. at 21-22.) And Townsend argues that Plaintiff cannot rescue her claim by making the conclusory allegation that Townsend "allowed or directed" Brooks to hold Plaintiff against her will. (Townsend Mem. at 22.) Plaintiff responds that for the same reasons Townsend violated her Fourth Amendment right against unreasonable seizures, Townsend falsely imprisoned her. (Pl. Townsend Resp. at 14.)

Virginia defines false imprisonment as "the restraint of one's liberty without sufficient cause." *Zaklit v. Global Linguist Sols., LLC*, 53 F. Supp. 3d 835, 846 (E.D. Va. 2014) (citing *Zayre of Va. Inc. v. Gowdy*, 147 S.E.2d 710, 713 (Va. 1966)). More specifically, "[i]f a person is under a reasonable apprehension that force will be used unless he willingly submits, and he does submit to the extent that he is denied freedom of action, this, in legal contemplation, constitutes

false imprisonment." *Zayre*, 147 S.E.2d at 713. Importantly, "it is not necessary to show malice, ill will or the slightest wrongful intention," and the defendant's good faith will not defeat a false imprisonment claim. *Id.*

Based on these principles, the Court finds that Plaintiff has alleged a plausible false imprisonment claim against Townsend. As with the Court's analysis of whether Townsend seized Plaintiff, the Court finds that Plaintiff's allegations support the plausible inference that Townsend effectively restrained Plaintiff's liberty by putting her in reasonable apprehension that she could not leave the Pre-Release Center without the use of force against her. Indeed, as mentioned, Brooks explicitly told Plaintiff that she could not leave in Townsend's presence, and Townsend confirmed that instruction by telling Plaintiff to discard her lunch. (Compl. ¶¶ 31-34.) And Plaintiff has alleged sufficient facts to support the inference that her apprehension that force would be used against her proved reasonable, including allegations that Plaintiff could not open the doors to the Pre-Release Center without the permission and assistance of a correctional officer, the dialogue between Plaintiff, Townsend and Brooks, Townsend's refusal to hold on to Plaintiff's lunch, and the fact that Townsend and Brooks both worked as correctional officers at the Jail.

Of course, as with Plaintiff's unreasonable seizure claim in Count Seven, should Townsend's mistaken belief that Plaintiff was an inmate prove reasonable, Townsend would have possessed the legal justification to seize Plaintiff and Plaintiff's false imprisonment claim would therefore fail. Indeed, "[c]laims for battery and false imprisonment under Virginia law frequently rise and fall with the reasonableness of the arrest/search underlying such claims." *Vollette v. Watson*, 937 F. Supp. 2d 706, 726 (E.D. Va. 2013). For now, because Plaintiff has

plausibly alleged that Townsend unreasonably believed that she was an inmate, the Court will deny Townsend's Motion to Dismiss as to Plaintiff's false imprisonment claim in Count Four.

### 3.   *Plaintiff States an IIED Claim Against Townsend.*

In Count Five, Plaintiff brings an IIED claim against Townsend and Brooks, alleging that their conduct caused her to suffer "severe emotional distress, including but not limited to, PTSD, anxiety, panic, sleepless nights, and other physical illness." (Compl. ¶ 114.) Townsend argues that Plaintiff cannot sustain such a claim against him, because Plaintiff's allegations fail to demonstrate that his conduct was sufficiently outrageous. (Townsend Mem. at 23.) Townsend further contends that Plaintiff has not alleged emotional distress severe enough to survive a motion to dismiss. (Townsend Mem. at 24.)

Plaintiff responds that IIED claims are fact-intensive and prove better suited for resolution on a motion for summary judgment or at trial. (Pl. Townsend Resp. at 15-16.) Plaintiff contends that because reasonable minds could view Townsend's conduct as sufficiently outrageous, and because Plaintiff has plausibly alleged the other elements of her IIED claim, the Court should not dismiss her claim at this stage. (Pl. Townsend Resp. at 16.) And Plaintiff maintains that she has alleged sufficiently severe emotional distress, because her distress caused her to seek medical attention and lose income, even though she ultimately completed her eight-week work assignment at the Jail. (Pl. Townsend Resp. at 18.) The Court agrees.

"[A] claim for intentional infliction of severe emotional distress requires proof of [1] severe emotional distress [2] proximately caused by [3] a defendant's outrageous conduct that is [4] intentional or reckless." *Almy v. Grisham*, 639 S.E.2d 182, 189 (Va. 2007) (citations omitted). Generally, IIED claims are "'not favored' in the law," because "the conduct cannot be defined objectively [and] clear guidance is lacking." *Id.* That said, "substantive claims for

intentional infliction of emotional distress under Virginia law need not be pled in federal court

with the degree of specificity required by Virginia courts." *Faulkner v. Dillon*, 92 F. Supp. 3d

493, 501 (W.D. Va. 2015) (alterations, internal quotations and citations omitted).  Therefore,

although a plaintiff in state court must plead "all facts necessary to establish a cause of action in

order to withstand challenge on demurrer," *Almy*, 639 S.E.2d at 187, plaintiffs in federal court

need only allege sufficient facts to "allow the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged," *Faulkner*, 92 F. Supp. 3d at 500-01 (internal

quotations and citations omitted).

Here, because Townsend challenges only the severity of Plaintiff's alleged emotional

distress and the outrageousness of his conduct, the Court will cabin its analysis to those

elements.  Indeed, as explained above, Plaintiff's allegations support the plausible inference that

Townsend acted recklessly and that his conduct caused Plaintiff to undergo the intrusive strip

search that allegedly caused her distress, satisfying the second and fourth elements of her IIED

claim.

As to the remaining elements, an IIED claim requires that the emotional distress suffered

by a plaintiff be "so severe that no reasonable person could be expected to endure it." *Russo v.

White*, 400 S.E.2d 160, 163 (Va. 1991).  Under this standard, the Virginia Supreme Court has

affirmed the dismissal of IIED claims based on allegations that the plaintiff "was nervous, could

not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was

unable to concentrate at work," though the court acknowledged that additional allegations could

sustain a claim, including allegations of an "objective physical injury caused by the stress," the

seeking out of "medical attention," confinement "at home or in a hospital," or "lost income." *Id.*

Similarly, federal courts applying Virginia law have sustained IIED claims at the motion-to-

dismiss stage based on allegations that the plaintiff sought out medical attention, experienced associated physical symptoms or had to alter his or her lifestyle due to emotional distress. *See, e.g.*, *Steele v. Goodman*, 382 F. Supp. 3d 403, 425-26 (E.D. Va. 2019) (plaintiff alleged "pain and suffering, physical injury, severe emotional trauma . . . [and] injury to reputation" as well as that "[h]is name and reputation have been publicly impugned"); *Holley v. CVS Caremark Corp.*, 2016 WL 4132316, at *4 (W.D. Va. Aug. 3, 2016) (plaintiff alleged "ongoing fear and anxiety," "physical inconvenience and other physical ramifications" and that she "was rendered less capable of performing her daily tasks"); *Faulkner*, 92 F. Supp. 3d at 502 (plaintiff alleged that she sought out counseling, refrained from intimate relations with her husband and became physically ill before going to work after co-worker sexually harassed her).

Based on these principles, the Court finds that Plaintiff has alleged emotional distress of sufficient severity to state an IIED claim. Specifically, Plaintiff alleges that she has "medically documented [PTSD] as a result of the violation of her rights at the Jail," as well as "anxiety . . . that forced her to arrive over 20 minutes early to each shift at the Jail to calm down as she prepared to go through the security checkpoint." (Compl. ¶ 56.) Plaintiff further alleges that she continues to take prescription medications and has been referred to counseling. (Compl. ¶ 57.) And Plaintiff avers that her emotional distress has "negatively affected her marriage[] and her relationship with her children," as well as caused her to both experience nightmares and work fewer hours, which in turn has caused her to "fall behind on her car and mortgage payments." (Compl. ¶ 57.) Plaintiff also alleges that her emotional distress "has forever changed her personality and ability to enjoy life." (Compl. ¶ 57.) These allegations, taken as true, support the plausible inference that Plaintiff experienced a level of emotional distress more severe than

mundane mental health issues and has in fact required medical treatment, impacted Plaintiff's family life and strained Plaintiff's employment and finances.

The question then becomes whether Plaintiff has alleged sufficiently outrageous conduct by Townsend. To that end, an IIED claim requires proof that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Russo*, 400 S.E.2d at 162 (internal quotations and citations omitted). Under this standard, a plaintiff cannot obtain relief for "'mere insults, indignities, threats, annoyances, [and] petty oppressions,'" which "'plaintiffs must necessarily be expected and required to be hardened to.'" *Simmons v. Norfolk W. Ry.*, 734 F. Supp. 230, 232 (W.D. Va. 1990) (quoting Restatement (Second) of Torts § 46 cmt. d). Notably, no objective, bright-line rule exists for what conduct rises to the requisite level of outrageousness. *Almy*, 639 S.E.2d at 189. Thus, the Court should dismiss Plaintiff's IIED claim only if reasonable minds could not differ on the outrageousness question. *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va. 1974). Ultimately, the Court must determine whether, considering the defendant's actions and the context within which the defendant acted, a reasonable person would exclaim, "'Outrageous!'" *Paroline v. Unisys Corp.*, 879 F.2d 100, 112 (4th Cir. 1989).

Plaintiff has alleged sufficient facts for reasonable minds to differ on whether Townsend acted outrageously. For one, Plaintiff alleges that Townsend served in a position of authority with control over the intake of inmates, which conferred on him a duty of care to ensure only individuals legally committed to the Jail underwent the intake procedures. (Compl. ¶ 24.) As part of his responsibility for the intake of inmates, Townsend possessed information and

resources to confirm the identity of those legally committed to the Jail. (Compl. ¶ 35.) Plaintiff also personally notified Townsend that she was a nurse assigned to work at the Jail. (Compl. ¶ 27.) Despite his control over the intake of inmates and the resources within his reach to confirm Plaintiff's inmate status, Townsend ignored Plaintiff's assertions as to her employment and effectively caused her to undergo a highly intrusive search of her naked body, including the exposure of her anogenital area to a complete stranger. (Compl. ¶¶ 35-47.) And Townsend sought out confirmation as to his mistaken assumptions only after Plaintiff had experienced what Townsend knew from experience would be an invasive process. (Compl. ¶ 49.) Accordingly, the Court denies Townsend's Motion to Dismiss as to Plaintiff's IIED claim in Count Five.

## IV.   CONCLUSION

For the reasons set forth above, the Court GRANTS IN PART and DENIES IN PART Townsend's Motion to Dismiss (ECF No. 14) and Brown's Motion to Dismiss (ECF No. 16). The Court DISMISSES WITH PREJUDICE Count One of Plaintiff's Complaint (ECF No. 1) as to all Defendants and DISMISSES WITHOUT PREJUDICE Count Six as to Townsend and Brooks.[8]

An appropriate order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date:  June 30, 2020

---

[8]     The Court dismisses Count One with prejudice, because Plaintiff concedes that no set of facts could overcome Defendants' sovereign immunity from suit under that count. (Pl. Townsend Resp. at 21-22; Pl. Brown Resp. at 14); *Billups*, 2020 WL 215500, at *6 n.1.

46