UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

BIKACHI AMISI,

      Plaintiff,

                                Civil Action No. 3:20-cv-00218

v.

BRYAN BROWN, *et al*.,

      Defendants

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT
LAKEYTA BROOKS'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW Plaintiff Bikachi Amisi, by counsel, and for her Memorandum in

Opposition to Defendant Lakeyta Brooks ("Brooks")'s Motion for Summary Judgment, states:

**I.     Introduction**

Lakeyta Brooks does not dispute that she strip searched Bikachi Amisi in the locker room

at Riverside Regional Jail ("RRJ") on September 5, 2019. She does, however, contend that she

did so based on a misunderstanding. She says she believed Amisi was a weekender inmate there

for intake. Crucially, she also provides supposedly undisputed facts that make her mistake seem

reasonable. Many of those facts are in fact disputed. Additionally, Brooks leaves out many

material facts that demonstrate the objective unreasonableness of her mistake.

While many of these facts are in dispute, which itself demonstrates that summary

judgment should not be granted, there are sufficient facts in the record for a reasonable jury to

find for Amisi on all counts. The record contains evidence that Amisi told Brooks she was a

nurse there for work. Amisi asked Brooks if all people who worked at the Jail had to be strip

searched. She asked to step outside and call her agency (a request that was denied). She was

wearing scrubs and carrying food and water she attempted to keep. Despite Amisi's verbal

protestations and the physical indications that she was not a weekender inmate, Brooks continued the highly invasive strip search of Amisi.

Plaintiff filed suit on March 31, 2020, against, among others, Brooks. The claims against Brooks were negligence, gross negligence, willful and wanton negligence, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and unreasonable search and seizure in violation of the Fourth Amendment. ECF 1. Brooks did not file a motion to dismiss; however, "in the interests of justice and judicial economy, where Plaintiff's facts fail[ed] to state a claim against Brooks for the same reason that Plaintiff fail[ed] to state a claim as to the other Defendants, the Court also dismisse[d] those claims." ECF 28, at 1 n. 1. Thus, this Court dismissed the negligence and negligent infliction of emotional distress claims as to Brooks on June 30, 2020. *Id.* at 2. Brooks now seems summary judgment on the remaining claims. The following section demonstrates that there are genuine disputes as to the material facts. Further, the record contains sufficient evidence for a jury to find in Amisi's favor on all counts. Brooks's motion for summary judgment should be denied and a jury should be allowed to decide these factual questions.

## II.     Response to Brooks's Statement of "Undisputed" Material Facts

¶ 1. Not disputed.

¶ 2. Not disputed.

¶ 3. Not disputed, but incomplete. Accountable was a subcontractor to Wellpath; Wellpath was the RRJ's medical contractor.

¶ 4. Not disputed.

2

¶ 5. Incomplete. Amisi arrived about "35 minutes early or so" and waited in her car. (Amisi deposition, hereinafter Exhibit 1,[1] at 118:12). She did not know where to park for the day, so about ten minutes to 8:00 am, she decided to drive to look for someone to direct her where to park. (Ex. 1 at 119:2, 13-15, 22-120:10).

¶ 6. Not disputed.

¶ 7. Disputed and misleading to the extent that Defendant implies Accountable gave Amisi such paperwork in the first place. Amisi testified that she signed a contract with Accountable online, but she was not given anything by Accountable to bring and present to the RRJ on September 5, 2019 or to prove her identity. Amisi was told the Jail was expecting her there. Accountable just asked her to take her ID (driver's license), which she did. (Ex. 1 at 113-114:1-15).

¶ 8. Disputed. The email chain referenced shows on its face that it was circulated among Accountable staff and was not sent to Amisi. Moreover, apart from the document itself not being addressed to Amisi, Amisi's testimony does not reflect that Amisi said she ever received this email. When asked if Accountable had sent her something in writing that had the name of the person she was supposed to ask for, Amisi said, "Probably. But I don't remember." When asked, "You didn't keep that, though, did you?" Amisi again said she did not remember and that she did not have any such paper with her at the time when she went to the Jail. Amisi also testified that she was not given anything by Accountable to present to the RRJ on September 5, 2019. (Ex. 1 at 113-114:1-15, 217:10-20).

¶ 9. Not disputed, but incomplete. Amisi also told Brown that "today was my first time to work and it's my orientation day." (Ex. 1 at 123:6-7).

---

[1] A List of Exhibits is attached as Exhibit 11.

¶ 10. Incomplete/disputed as phrased. Amisi testified that she understood that the person whom Accountable said would be expecting her at RRJ was named Mrs. Marshall. (Ex. 1 at 113:16-18). She could not remember or say "Marshall" when she encountered the defendants, however. She tried to give an approximate name ("Just said something like Mitch or –") and said she could not recall the name. (Ex. 1 at 217:4-9; 265:11-19 and Amisi statement, hereinafter Exhibit 9). She also just described to Brooks and the other defendants that she was a nurse coming to the jail for work, and she was supposed to have orientation with a specific woman whose name she could not recall. (Ex. 1 at 122:23-123:9; 128:6-16; 136:13-14, 18-19; 137:3-14; 145:18-21; 244:4-10).

When shown the Accountable email chain referenced in ¶ 8, Amisi acknowledged that "Marshall" might be "Harstall." But the document and her testimony reflect that she was never in receipt of the email previously and she does not know. (Ex. 1 at 216:7-16, 217:14-20).

¶ 11. Not disputed but incomplete. Brown instructed Amisi to enter the Pre-Release Center through the back entrance (the SP6 door inmates use). (Ex. 1 at 123:12-14, 124:23-25).

¶ 12. Not disputed but mischaracterized to the extent it suggests that weekender inmates or inmates on work release may enter or leave the RRJ Pre-Release Center as they please. They could not. (Townsend deposition, hereinafter Exhibit 2 at 188:22-189:6). Also, notwithstanding the Jail's terms "Weekender" and "Weekender [Weekend] Orientation," such inmates did not just serve time on weekends at the Pre-Release Center. They served their sentences on non-consecutive days which might be any days of the week. (Ex. 2 at 57).

¶ 13. Not disputed.

¶ 14. Not disputed but mischaracterized to the extent it suggests that "Weekenders" can enter or leave the RRJ Pre-Release Center without the permission and assistance of RRJ correctional officers. They could not. (Ex. 2 at 188:22-189:6).

¶ 15. Not disputed but mischaracterized to the extent it suggests that work-release or weekender inmates can enter or leave the RRJ Pre-Release Center without the permission and assistance of RRJ correctional officers. They could not. (Ex. 2 at 188:22-189:6).

¶ 16. Disputed to the extent that this suggests that inmates could freely control the Sally Port 6 (SP6) door themselves. SP6 is a secure door. (Ex. 2 at 188:22-189:6; Lieutenant Rose Deposition, hereinafter Exhibit 5, at 28:15-24).

¶ 17. Not disputed.

¶ 18. Disputed that weekender orientation began at 8:00 a.m. Rose testified that it began at 7:00 am. (Ex. 5 at 22:10-11, 33-35). Also, notwithstanding the Jail's terms "Weekender" and "Weekender [Weekend] Orientation," such inmates did not just serve time on weekends at the Pre-Release Center. They served their sentences on non-consecutive days which might be any days of the week. (Ex. 2 at 57).

¶ 19. Not disputed, but incomplete. Every time a weekender inmate enters the building, they are to be strip searched (not just before their orientation). (Ex. 2 at 63).

¶ 20. Disputed. RRJ's policy 22.02.002 Pre-Release Center Intakes states at 1.1.2 in pertinent part that "**Prior to accepting custody of an inmate, staff determines that the inmate is legally committed to the facility, and that the inmate is not in need of immediate medical attention (2A19)**. The Pre-Release Staff will verify all documentation of the reporting FBOP and Weekenders before accepting any intakes to be housed in the Pre-Release Center prior to being admitted. Staff will take all necessary steps to verify the reporting individual is ordered

and scheduled to report to the Pre-Release Center as FBOP or Weekender." (emphasis original). (Policy, hereinafter Exhibit 10). Rose testified that in interviews with Capt. Langley where she was present after the incident, Brooks (and Townsend and Brown) all admitted that they knew this policy and procedure. (Ex. 5 at 132:8-20, 133:10-134:3). She also said that when Brooks (and Townsend and Brown) were assigned to Housing Unit 6 (the Pre-Release Center), they are given a book with policies pertaining to that area that they had to read and sign off on, which they did. (Ex. 5 at 134:18-22, 135:17-22). Rose testified that Brooks should have checked the documentation in intake to verify that Amisi was a weekender before strip searching her. (Ex. 5 at 144:9-25, 148:12-24). *See also* ECF 79-18, Rose Memo to Brooks, filed under seal, which mentions the above policy. Brown also testified that Brooks was supposed to confirm that Amisi was a weekender inmate before doing a strip search, by looking for a file for Amisi, and, if a file was not present, Brooks was to call Weekender Coordinator Roney herself. (Brown Deposition, hereinafter Exhibit 4, at 164:17-25).

¶ 21. Not disputed.

¶ 22. Not disputed, but incomplete. As indicated in Brooks's ¶ 24, Brooks was also conducting female strip searches in Intake on September 5, 2019.

¶¶ 23-24. Not disputed.

¶ 25. Disputed. According to Brown, Brooks was present with him when Amisi came in the lobby and Brown told Amisi to go to the back of the building. Per Brown, "A matter of maybe a couple seconds later, Officer Brooks asked me hey, do you mind coming in here [to Primary Control] real quick while I go pull in these work release females." (Ex. 4 at 101:2-15, 119:11-21). According to Brown, Brooks told him after the incident that Brooks brought Amisi in for a strip search because Brooks was already back in Intake searching female work release

inmates. Amisi was there as well, so Brooks "went ahead and brought her in." (Ex. 4 at 142:16-18, 143:1-3).

¶ 26. Disputed. *See* response to ¶ 25, incorporated herein by reference. Brown's testimony differs.

¶ 27. Confusing as phrased but not disputed that prior to Brooks's leaving Primary Control, Brown took over the Primary Control position.

¶ 28. Disputed. According to Brown, when Amisi first came into the lobby, Brooks (and Rose) were present with him. (Ex. 4 at 101:2-15). While Amisi did not think there were other people in the lobby, she testified that Brown was at his desk and "I was looking at him. I don't know if other people were in the offices that were open. I don't know. I couldn't see." She said she did not know if there were other people in the lobby area. (Ex. 1 at 245:6-14). Primary Control is a booth in the lobby that is enclosed in Plexiglass. (Ex. 4 at 101:11-17). According to Brown, Brooks was working inside the Primary Control booth when Amisi came into the lobby. (Ex. 4 at 109:7-8).

¶ 29. Not disputed.

¶ 30. Disputed. According to Brown, Brooks was working inside the Primary Control booth when Amisi came into the lobby. (Ex. 4 at 109:7-8). Brown said he was outside of the booth, but near the booth. (Ex. 4 at 101:6-15, 102:11-14). Amisi testified that Brown was in the lobby at his desk (not in a booth) when she encountered him. (Ex. 1 at 245:6-7).

¶ 31. Not disputed, but incomplete as phrased. Brown again instructed Amisi to go around to the back of the building and buzz at the back door of the Pre-Release Center (SP6) to be let in. (Ex. 1 at 124:22-25).

¶ 32. Not disputed, but again, there are multiple doors to the Pre-Release Center. Plaintiff left the lobby and walked around the building to the Pre-Release Center's back door, SP6, where Brown directed her. (Ex. 1 at 124:22-25).

¶ 33. Disputed. Brown testified that the door was left open by Brooks despite it being a secure door. (Ex. 4 at 90:4-21).

¶ 34. Not disputed but incomplete. Townsend testified that he had to open the secure SP5 door for Amisi to get into Intake; she did not walk through it by herself. (Ex. 2 at 164:16-18).

¶ 35. Not disputed.

¶ 36. Not disputed, but incomplete. Amisi also told Townsend that "today would be my first day to work there." Although she could not remember the name of the lady she was to meet, Amisi said she had an appointment with the woman at 8 o'clock for her orientation. (Ex. 1 at 128:10-16).

¶ 37. Disputed. Amisi testified that she had never heard the word "weekender" until later after the incident on September 5, 2019. Amisi testified that she was not asked whether she was there for weekender orientation. Amisi denied that she had heard anyone use the term "weekender orientation" to her from the time when she arrived at RRJ on September 5, 2019, through the time when she exited the locker room with Brooks after the strip search. Amisi testified that no one had used the term "weekender" in talking with her at any point prior to her leaving the locker room after the strip search. (Ex. 1 at 123:18-21; 125:1-3; 145:1-3; 189:7-19; 144:20-25; 146:4-7, 10). Amisi also testified, "They never referred to me as a weekender." (Ex. 1 at 148:18-19, 23-24; 150:2-3).

¶ 38. Not disputed.

8

¶ 39. Not disputed but mischaracterized. Amisi was not "another incoming female" as she was not an inmate.

¶ 40. Disputed. Brown stated that Brooks was in the Primary Control booth in the lobby of the Pre-Release Center when Amisi entered and spoke to Brown. (Ex. 4 at 101:6-10; 109:7-8). *See also* responses to ¶¶ 28 and 30, incorporated herein by reference.

¶ 41. Disputed, *see* response to ¶ 37, incorporated herein by reference.

¶ 42. Disputed that Plaintiff answered in the affirmative that Plaintiff was there for weekender orientation, *see* response to ¶ 37, incorporated herein by reference. Not disputed that Townsend may have told Brooks that Plaintiff was there for weekender orientation. Amisi saw Brooks and Townsend speaking and Townsend pointing at her, but she could not hear them. (Ex. 1 at 131:15-21). However, Townsend disputes this. (Ex. 2 at 210:12, 233:11-234:1, 297:7-24).

¶ 43. Irrelevant. Brooks's mental impressions are not facts and improper for a motion for summary judgment. Plaintiff's claims do not involve subjective intent. Further, there were numerous objective facts demonstrating to Brooks that Amisi was not a weekender inmate, as discussed through these responses to Brooks's statement of "undisputed" facts. *See* responses to ¶¶ 37, 46-48, 51-52, incorporated herein by reference. Additionally, Brooks knew that Townsend typically had folders in Intake for the persons that were supposed to be reporting to the RRJ for inmate weekender orientation on a given day. Brooks did not ask Townsend whether he had a folder for Amisi for weekender orientation. Brooks also never looked at the folders herself. (Brooks Deposition, hereinafter Exhibit 3, at 118:8-15, 134:21-135:9, 136:2-4).

¶ 44. Not disputed. But Amisi thought Brooks was taking her for her orientation in connection with her job as a nurse; she did not know she was being taken into a locker room for a strip search. (Ex. 1 at 137:6-14; 263:10-14).

9

¶ 45. Disputed, *see* response to ¶ 37, incorporated herein by reference.

¶ 46. Mischaracterized and incomplete. Amisi's statements to Brooks about the food and water Amisi had brought with her for lunch provided further evidence that Amisi was not there as an inmate. Amisi said, "Why I shouldn't bring food? I will be working for 12 hours." She said she did not know food would be provided. And, Amisi said, "Maybe I can keep it and at the end of the day when I leave, I can take it home with me." (Ex. 1 at 134:21-24, 135:13-16). Additionally, Amisi threw away her food after the strip search because Brooks directed her to do so. Brooks had previously told Amisi that Amisi had to throw away her food and could not keep it. (Ex. 1 at 135:7-9, 17; 143:8-10).

¶ 47. Not disputed. But incomplete. Amisi also repeatedly told Brooks that she was there to work. (Ex. 1 at 134:22-23, 136:13-21, 138:16-139:7, 176:12, 274:17-19). Amisi told Brooks that her agency had not told her about her having to undergo a strip search and asked to leave to go call them, but Brooks said Amisi could not leave.

¶ 48. Disputed. Amisi testified that she referred to eight weeks. Amisi asked Brooks if she would be undergoing a strip search every day when she came to work for eight weeks and Brooks said "yes." (Ex. 1 at 274:17-19).  Amisi's contract with Accountable was for eight weeks, *see* ¶ 4.

¶ 49. Mischaracterized. Brooks ordered Amisi to take her clothes off. As Amisi stated, Brooks "was very like persistent and authoritative and she said: Take your clothes off. So I didn't have any choice and I just – to do that." (Ex. 1 at 139:16-19). Brooks first ordered Amisi to take off her top. Then Brooks ordered Amisi to take off her bra and shake the bra. Then, Brooks ordered Amisi to take off her pants and shake them. Brooks thereafter ordered her Amisi

to take off her underwear. Brooks' orders required Amisi to be completely naked. (Ex. 1 at 140:1-141:14; 267:21-268:4).

¶ 50. Not disputed but incomplete. While Amisi was squatting and coughing, Brooks "look inside of me. You know, how she -- she had to make sure I had nothing." (Ex. 1 at 142:21-22).

¶ 51. Disputed. Amisi did not ask if nurses do strip searches. Amisi asked Brooks, "You have to search people who work here?" And Brooks said "yes." (Ex. 1 at 136:13-15). Amisi did also explain that "I am a nurse and I'll be working here." And she asked, "Which mean every day I come here, I have to take my clothes off?" And Brooks said "yes." (Ex. 1 at 136:18-21).

¶ 52. Disputed. Brooks did not inform Amisi that all types of people came to serve time and they all had to be strip searched. Amisi asked Brooks if everyone who worked at the jail had to be strip searched every day. And Brooks said "yes." (Ex. 1 at 138:16-18).

¶ 53. Disputed. The comment cited was not in response to Amisi learning that "all **inmates** entering or reentering the jail were required to undergo a strip search." (emphasis added). Rather, Amisi preceded her comment with "I wanted to know if everyone that **works** there, they do them search every day." And Brooks responded, "Yes." And then Amisi responded, "My agency didn't tell me this. … I wish they told me." (Ex. 1 at 138:16-24) (emphasis added). Moreover, also in response to Brooks's answer about all workers being strip searched, Amisi asked to leave and go call her agency. Amisi conveyed that if her agency had told her about the strip search and she knew about it, she "couldn't accept to come here." She had left her phone in her car and wanted to go out and call the agency. But Brooks said, "No, you cannot go out." Brooks also said, "Once you in, you can't go out. And you can't call them. You have to take your clothes off." (Ex. 1 at 138:19-139:7).

¶ 54. Not disputed. But irrelevant to Amisi's claims.

¶ 55. Not disputed, but Amisi came out of the locker room with Brooks and was further directed by her. Brooks had Amisi spread her legs and put her hand on the wall while Brooks did a pat down search. And then Brooks told Amisi to sit again in the chair area where she had been sitting before the strip search. (Ex. 1 at 146:24-25; 150:14-18).

¶ 56. Not disputed.

¶¶ 57-58. Not disputed.

¶ 59. Not disputed, but incomplete. Amisi also told Roney that she was a nurse and today was her first day to work and she was looking for a specific female person whose name she could not remember for her orientation. (Ex. 1 at 153:19-154:1).

¶ 60. Mischaracterized/disputed as phrased. When asked if speaking with Roney was the first time that Amisi had said she was sent there by Accountable, Amisi said she thought so: "Accountable, I think that was the first time I said Accountable because [Roney] asked me who sent me." (Ex. 1 at 153:6-12). As noted above, however, while she did not say the name "Accountable," Amisi did tell Brooks about her agency and in the context of asking if everyone who works at the jail must undergo a strip search. Amisi conveyed that her agency had not told her about the strip search and that if she had known about it, she "couldn't accept to come here." Amisi also asked to leave the jail to go call her agency, but Brooks would not permit it. (Ex. 1 at 138:16-139:7).

¶ 61. Not disputed that Roney testified that Amisi "wasn't crying." However, Roney also said "Anything else, I really don't remember." She said that beyond lack of crying, she was unable to characterize Amisi's emotional state. (Roney Deposition, hereinafter Exhibit 8, at 110:11-16). Amisi also described her observations of Roney and stated that Roney "just stood

there like just looking at me, just like in shock" after Amisi told Roney what had happened. (Ex. 1 at 154:2-4). Amisi certainly contends that she was emotionally harmed; *see* section III(E)(2) herein.

¶ 62. Not disputed.

¶ 63. Disputed as phrased. While Brooks testified that she was not aware that Amisi was not a weekender inmate until after the strip search, this is a jury question due to the numerous material disputed facts. *See* responses to ¶¶ 25-26, 37, 42, 46, 47, 48, 51, 52, 53, 60, incorporated herein by reference.  Additionally, regarding "when Defendant Brown explained that Plaintiff was supposed to have been working at RRJ," Amisi contends that she told Brooks multiple times that she was at the RRJ to work. (Ex. 1 at 134:22-23, 136:13-21, 138:16-18, 176:12, 274:17-19; *See also* Ex. 1 at 138:19-139:7). To the extent that the statement implies that Brooks's mistake was reasonable, such is disputed. To the extent that it is implied that Brooks received no information concerning Amisi not being a weekender prior to speaking to Brown after the strip search, such is disputed.

¶ 64. Disputed as phrased. Amisi described seeing Brooks outside in the front of the Pre-Release Building, which is where she was told to meet the nurse taking her to the main jail after she was released from the Pre-Release Center. (Ex. 1 at 158:5-11, 159:10-13).

¶ 65. Not disputed.

¶ 66. Not disputed that Officer Brooks testified this way. Disputed that Brooks said this to Plaintiff. *See* ¶ 65.

¶ 67. Disputed as phrased. Amisi was asked, concerning the relevant time (September 5, 2019, while she was in the jail), "At some point it occurred to you these officers had misunderstood why you were there, correct?" and she said "No, ma'am." She was then asked,

13

"That never - - you never came to any understanding that these officers had misunderstood why you were there?" And she responded, "No." (Ex. 1 at 148:6-13). The quotation that Brooks cites to concerns when Amisi was asked about her understanding *on the day of her deposition* in this case, in March 2021 ("As you sit here today…"). (Ex. 1 at 148:14-17). That was, of course, well after the strip search and after litigation had long been ongoing.

¶ 68. Disputed. Amisi made the quoted comment when speaking of her impression *as of the date of her deposition*, in March 2021. Right before that, Amisi was asked, concerning the relevant time (September 5, 2019, while she was in the jail), "At some point it occurred to you these officers had misunderstood why you were there, correct?" and she said "No, ma'am." She was then asked, "That never - - you never came to any understanding that these officers had misunderstood why you were there?" And she responded, "No." (Ex. 1 at 148:6-13). Moreover, Amisi repeatedly testified that she did not know the term "weekender" until after the relevant events, and that no one referred to her as a "weekender" or otherwise used that term or "weekender orientation" on September 5, 2019. *See* response to ¶ 37, incorporated herein by reference.

¶ 69. Not disputed, but irrelevant to Plaintiff's claims.

¶ 70. Disputed. Amisi acknowledges that her bank statement has a charge for LA Nails entered on September 5, 2019 but testified that while she remembers going to LA Nails one day, she cannot remember the specific date. (Ex. 1 at 195:5-16). In any event, this is a motion for summary judgment where Brooks contests Amisi's liability claims. This issue is irrelevant here. While Amisi maintains that it is also irrelevant to her damages claims, to the extent that Brooks would like to make that claim, it is a claim for a jury.

### III.     Argument

#### A.     Standard of Review

Summary judgment is appropriate only when the movant, citing to supporting materials in the record, shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) & (c). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party must set forth facts, citing to particular parts of the record (although the court may also consider other materials in the record (Fed. R. Civ. P. 56(c)(3)), sufficient to show that that there are genuine issues for trial. *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). However, if a defendant is asserting an affirmative defense at summary judgment, "it must conclusively establish all essential elements of that defense." *Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d 294, 299 (4th Cir. 2012)). At summary judgment, the court "must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Variety Stores*, at 659 (internal citations and alternations omitted). Also, summary judgment is not appropriate even if there is no dispute as to the evidentiary facts, but when the parties dispute the ultimate factual *conclusions* to be drawn from those facts. *Overstreet v. Kentucky Cent. Life Ins. Co*., 950 F. 2d 931, 937 (4th Cir. 1991).

#### B.     Constitutional Claims

##### 1.     There is sufficient evidence in the record for a jury to find that Brooks unreasonably searched and seized Amisi.

In determining whether a seizure has occurred, "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the [correctional officer's] conduct

would 'have communicated to a reasonable person that [s]he was not at liberty to ignore the [correctional officer's] presence and go about [her] business.'" *Florida v. Bostick*, 501 U.S. 429, 437 (1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)). The record contains sufficient evidence about Defendant Brooks's interactions with Amisi that a jury could find that a reasonable person in her situation would not feel free to leave. Among other things, when Amisi asked to leave to call her agency, Brooks said, "No, you cannot go out." And Brooks further said, "Once you in, you can't go out. And you can't call them. You have to take your clothes off." Ex. 1 at 138:19-139:7. Moreover, two secure doors – SP5 and SP6 – separated Amisi from the outside. Ex. 2 at 188:22-189:6.

Numerous objective facts exist in the record that would allow a jury to determine that Brooks's mistake of fact—treating Amisi as an inmate—was unreasonable. Amisi told Brooks that she was a nurse and that she would be working there. Ex. 1 at 136:18-20. She told Brooks her agency had not informed her about a strip search. And that if her agency had done so, she would not have come to the jail. *Id*. at 138:16-24. She asked Brooks if she could leave. *Id*. at 138:19-22, 139:1-7. She asked, "You have to search people who work here?" and asked if everyone who worked at RRJ had to do a strip search every day. *Id*. at 136:13-14; 138:16-18. She asked if she could contact her agency. *Id*. at 138:16-139:7. She asked to keep her food and water. *Id*. 134:18-136:1. She mentioned needing her food because she "will be working for 12 hours" and she did not expect that the jail would provide food. *Id.* at 134:21-24. But Brooks never checked the weekender inmate files in Intake herself to verify that Amisi was an inmate over which the jail had custody, and she never asked Townsend if there was a file or to show her the file. Ex. 3 at 118:8-15, 134:21-135:9, 136:2-4. Instead, Brooks forced Amisi to strip naked in front of her, squat, and cough. Ex. 1 at 140-142, 267:21-23. Considering the plentiful signs a jury

could determine were available to Brooks that Amisi was not an inmate, the jury could find Brooks's mistake of fact was unreasonable and her actions violated the Fourth Amendment.

Brooks argues her encounter with Amisi was consensual and even if it was not, that her mistake of fact was reasonable. ECF 64 at 25-26. Brooks supports these arguments with citations to disputed facts and incomplete statements of fact. Brooks boldly states that "at all times Plaintiff was free to clarify her status as an employee and leave the facility." *Id*. at 25. However, Amisi attempted to do just that. She continued to state she was a nurse who was there to work, and she asked to leave. Ex. 1 at 136:18-20, 137:6-10, 138:14-139:19. Her attempts were rebuffed though. *Id*. Brooks also states that she "asked Plaintiff if she was there for weekender orientation two times." ECF 64 at 26. Again, Amisi disputes this. *See* response to ¶ 37 above. Brooks and Amisi, and others, differ in their recitations of the facts. Those differences cannot be reconciled on a summary judgment motion. The operative question is whether sufficient facts in the record exist such that "a reasonable jury could return a verdict" finding that Brooks acted unreasonably in violation of the Fourth Amendment. *Dulaney v. Packaging Corp. of Am.*, 673 F.3d. 323, 330 (4th Cir. 2012). As shown above, the answer is yes and Brooks's motion should be denied.

### 2.    Brooks's strip search of Amisi violated clearly established law.

Qualified immunity is an affirmative defense, and thus the burden is on Brooks to establish each element of the defense at this stage. *See Ray Communs., Inc. v. Clear Channel Communs., Inc.*, 673 F.3d. 294, 299 (4th Cir. 2012). Brooks has failed to do so. She misconstrues the qualified immunity standard and essentially argues mistake of fact, which goes to whether her actions violated the Fourth Amendment, not whether she is entitled to qualified immunity.

Qualified immunity protects government officials when they make "bad guesses in grey areas." *Wilson v. Kittoe*, 337 F.3d 392, 403 (4th Cir. 2003) (quoting *Mariariello v. Sumner*, 937

F.2d 295, 298 (4th Cir. 1992)). To carry her burden for this defense, Brooks must demonstrate either: that she did not violate a statutory or constitutional right, or that the right she violated was not clearly established at the time of the relevant conduct. *See Ashcroft v. al-Kidd*, 563. U.S. 731, 735 (2011). Importantly, "the exact conduct at issue need not have been held unlawful for the law governing an officer's actions to be clearly established." *Amaechi v. West*, 237 F.3d 356, 362 (4th Cir. 2001) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Significant to the claims Brooks is making and why she is mistaken, the Fourth Circuit "has consistently conducted an objective analysis of qualified immunity claims and stressed that an officer's subjective intent or beliefs play no role." *Henry v. Purnell*, 652 F.3d 524, 535 (4th Cir. 2011).

The sections above demonstrate a jury could find that Brooks did violate Amisi's Fourth Amendment rights, leaving only the question of whether those rights were clearly established in September 2019. As this Court previously noted, the mistake of fact question goes to whether search and seizure were unreasonable, not to the qualified immunity question. ECF 28 at 30; *see also Henry v. Purnell*, 652 F.3d 524, 534 (4th Cir. 2011). Thus, the proper question is whether the right of a prison employee "not to be subjected to a strip search and its attendant seizure without reasonable and individualized suspicion of hidden contraband" was clearly established as of September 5, 2019. ECF 28 at 30. As this Court held, the Fourth Circuit answered that question in the affirmative in 2011. *See Braun v. Maynard*, 652 F.3d 557, 558 (4th Cir. 2011). Brooks violated a clearly established right and should not be granted qualified immunity.

Brooks argues that she mistakenly believed Amisi was an inmate and therefore did not violate clearly established law because the strip searching of incoming inmates does not violate the Fourth Amendment. *See* ECF 64 at 24. First, as addressed in the sections above, that mistaken belief was not reasonable. Second, qualified immunity is an objective analysis based on

the relevant facts and circumstances. What Brooks subjectively believed is irrelevant. *See Henry v. Purnell*, 652 F.3d 524, 534-35 (4th Cir. 2011). As held in *Henry*, "[a]lthough officers are only human and even well-intentioned officers may make unreasonable mistakes on occasion, the doctrine of qualified immunity does not serve to protect them on those occasions." *Id*. at 535. A jury could find that Brooks made an unreasonable mistake in violation of Amisi's clearly established Fourth Amendment rights. She should not be afforded qualified immunity.

### C.      The Virginia Workers' Compensation Act does not bar Amisi's claims.

Amisi's injury did not arise out of and in the course of her employment; therefore, it is not barred by the Virginia Workers' Compensation Act (the "Act")'s exclusivity provision.[2] Virginia Code Section 65.2-307(A), known as the exclusivity bar, provides that if an injury falls under the Act, all other rights and remedies under state common law cannot be utilized. *See Combs v. Virginia Elec. & Power Co.*, 259 Va. 503, 508 (2000). To be subject to the bar, a plaintiff's claim must be an injury by accident that arose out of and in the course of the plaintiff's employment. All three elements must be present. *See id*. Further, when "the employee invokes the provisions of the Act, it should be liberally construed in favor of the employee, and, hence, coverage." *Morgan v. MDC Holdings, Inc*., 54 Va. Cir. 45, 49 n. 4 (Fairfax Circuit Court 2000). However, if not invoked by the employee, as is the case here, "the Court must take care to leave the employee's common-law remedies against the employer unimpaired." *Id*.

At the motion to dismiss stage, this Court noted that Amisi had conceded that RRJA was her statutory employer and held that Amisi's injury was by accident but did not arise out of her employment at RRJA. *See* ECF 28 at 13-18. This Court declined to rule on whether the injury

---

[2] As this Court noted previously, Plaintiff's state law claims must be addressed using Virginia substantive law. *See* ECF 28 at page 12.

arose in the course of Amisi's employment because that decision was rendered superfluous. *See* ECF 28 at 18 n. 4. None of the facts adduced during discovery or proffered by Brooks could change this Court's conclusion that "there exists no rational causal connection between Plaintiff's employment and her exposure to the risk of being subjected to inmate intake procedures." ECF. 28 at 17 (citation omitted). As this Court has noted, the defendants' primary argument—that they mistook Amisi for an inmate— "all but foreclos[es] the possibility that Plaintiff's injuries arose out of the conditions of her employment." ECF 28 at 18.

Brooks first argues that RRJA is Amisi's statutory employer. ECF 64 at 12-13. Amisi has conceded that point.[3] Second, Brooks argues that "the injury arose out of Plaintiff's employment because her employment at the jail required her to go through orientation, which exposed her to the risk of being mistaken for a weekender inmate who must also go through orientation." *Id*. at 15. This argument fails because there is no causal connection here between the conditions under which Amisi was required to work and her injuries. *See Combs v. Virginia Elec. and Power Co*., 259 Va. 503, 509 (2000). It would be hard to imagine RRJA, or the entities it subcontracts through, requiring Amisi to spend time undergoing inmate processing in the Jail's Pre-Release area as a requirement of her job as a nurse. Nor can being strip searched be considered a requirement of Amisi's work conditions. Further, there was testimony that weekender orientation and new employee orientation occurred in different buildings, bolstering the fact that Amisi would not have been in the Pre-Release Center absent defendants' negligence. *See* Ex. 4 at 55:13-56:3, 85:17-22; Ex. 5 at 20:5-8. Thus, her injury did not arise out of her employment.

---

[3] Brooks also argues that Amisi's injury was an accident under the Act. ECF 64 at 15. This Court already held such at the motion to dismiss stage, ECF 28 at 14-16, and Plaintiff is not challenging that ruling.

As for whether Amisi's injury arose in the course of her employment, an accident occurs "in the course of the employment when it takes place within the period of the employment, at a place where the employee may reasonably be, and while he is reasonably fulfilling duties of his employment or engaged in doing something incidental thereto." *Combs*, at 511. While it can be argued that Amisi's injuries took place "within the period of the employment," they did not occur at a place she would reasonably be, nor did they occur while she was reasonably fulfilling duties of her employment as a nurse.

Absent defendants' negligence, Amisi would never have stepped foot in the Pre-Release Center. And the process of being strip searched certainly does not fall within the duties of her nursing employment. *See Conner v. Bragg*, 203 Va. 204, 210 (1962) (holding that an injury did not occur in the course of employment because the injured worker had been "in a place where he was not reasonably expected to be, and [his activity at the time] was not incidental to the reasonable fulfillment of his employment contract"). The same conclusion should be reached here.

**D**.    **State Law Negligence Claims**

In Virginia, negligence requires "a legal duty, a violation of the duty, and consequent damages." *Burns v. Gagnon*, 283 Va. 657, 668 (2012) (citation omitted). Questions of negligence are generally "issues for a jury's resolution." *Griffin v. Shively*, 227 Va. 317, 320 (1984).

**1.    Brooks owed a duty of ordinary care to Amisi.**

Brooks first argues that she did not owe Amisi a duty and therefore no negligence claims can be brought against her. *See* ECF 64 at 16-17. Contrary to that assertion, Brooks owed Amisi a duty of ordinary care just as this Court found that Townsend and Brown did. ECF 28 at 33. Under Virginia law, "[g]eneral negligence principles require a person to exercise due care to

avoid injuring others." *Quisenberry v. Record No. 171494 Huntington Ingalls, Inc*., 296 Va. 233

242 (2018). That duty is owed "to those within reach of a defendant's conduct." *Id*. (quoting

*RGR, LLC v. Settle*, 288 Va. 260, 275 (2014)). No specific relationship is needed to be shown to

establish a duty under general negligence principles. All that is required "is a sufficient

juxtaposition of the parties in time and space to place the plaintiff in danger from the defendant's

acts." *RGR*, 288 Va. at 280.

As this Court held regarding Defendants Townsend and Brown, Brooks had "the sole

discretion to determine whether Plaintiff would be exposed to the strip search that caused her

alleged injuries." ECF 28 at 34. That created a duty for Brooks to act with ordinary care towards

Amisi to prevent injury to her: namely, being strip searched under inmate intake procedures.

## 2.     The record contains sufficient evidence for a jury to find Brooks acted with gross negligence.

Gross negligence is "such a degree of negligence as would shock fair minded [people]

although something less than willful recklessness." *Ferguson v. Ferguson*, 212 Va. 86, 92

(1971). In addition, "[s]everal acts of negligence which separately may not amount to gross

negligence, when combined may have a cumulative effect showing a form of reckless or total

disregard for another's safety." *Chapman v. City of Virginia Beach*, 252 Va. 186, 190 (1996).

Gross negligence claims are evaluated based on an objective, reasonable person standard, *Hixson*

*v. Hutcheson*, No. 5:17-CV-032, 2019 U.S. Dist. LEXIS 11326 *19 (W.D. Va. Jan. 23, 2019).

Brooks had a duty to verify Amisi's identity before strip searching her. Brooks had the

ability to do so, by checking the weekender inmate files in Intake (and Lieutenant Rose also

testified that under the jail's procedures, which Brooks admitted knowing, Brooks was supposed

to do so. Ex. 5 at 132-135, 144:9-25, 148:12-24. Brown also testified that Brooks was supposed

to confirm Amisi's status by looking for a file and calling Roney if none was present, prior to a

22

strip search. Ex. 4 at 164:17-25. There was no file for Amisi. Ex. 2 at 126:23-24. But Brooks never made this inquiry.

Before Brooks took Amisi into the locker room, Amisi told her that she was there for orientation in connection with her being a nurse there for her first day. Ex. 1 at 137:6-14. Then, in the locker room, when Brooks told Amisi she could not have her food or water, Amisi said, "Why I shouldn't bring food? I will be working for 12 hours." *Id*. at 134:21-24. Then, Amisi asked to keep her food so she could eat it after her shift. *Id*. at 135:13-16. But Brooks did not stop to verify that Amisi was committed to the jail and not an employee – the kind of person who would be working at a jail and bringing her own meals. When Brooks told Amisi that she had to take her clothes off for a search, Amisi asked, "You have to search people who work here?" And protested "Take my clothes off?" But Brooks was unphased and said "yes." *Id*. at 136:11-17. Amisi again tried to explain her astonishment by saying, "I am a nurse and I'll be working here." *Id.* at 136:18-19. But Brooks again did not change course. Amisi asked Brooks if "everybody that works there" needs to be strip searched every day. *Id*. at 138:17-18. When Brooks said "yes," Amisi said her agency had not told her about a strip search and she said she wanted to go outside and call them. She also said she "couldn't accept to come here" if her agency had told her about the strip search. *Id*. at 138:19-139:2. Brooks told Amisi that Amisi could not leave and had to take her clothes off. *Id*. at 139:3-7, 16-19. Despite these explicit statements and contextual implications that Amisi was, in fact, not a weekender inmate, Brooks continued her plans and subjected Amisi to a highly invasive strip search, which included examining Amisi's bodily cavities after making her squat and cough. *Id*. at 142: 9, 19-22.

Brooks's arguments to the contrary rely almost entirely on disputed facts and asking the Court to make improper credibility determinations. Brooks again incorrectly states that it is

undisputed that she asked Amisi if Amisi was there for "weekender orientation." ECF 64 at 18. This is disputed. *See* response to ¶ 37 above. Brooks also leaves out that Amisi told Brooks she was a nurse, said she was there for work, asked to leave, and all the other facts discussed in the preceding paragraph. Viewing the record in the light most favorable to the Plaintiff, there are sufficient facts for a jury to find that Brooks acted with gross negligence in strip searching the non-inmate Amisi.

### 3. The record contains sufficient evidence for a jury to find Brooks acted with willful and wanton negligence.

Willful and wanton negligence is defined as an "action taken in conscious disregard of another's rights, or with reckless indifference to consequences that the defendant is aware, from his knowledge of existing circumstances and conditions, would probably result from his conduct and cause injury to another." *Kaltman v. All American Pest Control, Inc*., 281 Va. 483, 494 (2011) (quoting *Alfonso v. Robinson*, 257 Va. 540, 545 (1999)). Additionally, "evidence that a defendant had prior knowledge or notice that his actions or omissions would likely cause injury to others is a significant factor in considering issues of willful and wanton negligence." *Alfonso*, 257 Va. at 546. Willful and wanton negligence also is normally an issue of fact for the jury to determine. *See Griffin v. Shively*, 227 Va. 317, 320 (1984).

Brooks again argues that her mistake regarding Amisi's identity means she did not act with willful and wanton negligence. ECF 64 at 19. She also again refers to her contention that she asked Amisi if she was a weekender, which, again, Amisi disputes. *Id*; *see* response to ¶ 37. Based on her position at the Jail, Brooks knew the invasive nature of the strip searches incoming inmates were subjected to. As noted in the gross negligence section, she had ample information that Amisi was an employee, not an inmate. Moreover, while Amisi could not recall the person's name, she told Brooks that she had an orientation that morning with a

specific female person. And in the context of introducing herself as a nurse who was there to work. *See* response to ¶ 10. Despite everything known to her, Brooks proceeded to imprison and strip search Amisi. A jury could find this constituted willful and wanton negligence.

### E.      Remaining State Law Claims

#### 1.      For the same reason a jury could find that Brooks unreasonably seized Amisi, it could also find Brooks falsely imprisoned Amisi.

In Virginia, "[f]alse imprisonment is defined as the direct restraint by one person of the physical liberty of another without adequate legal justification." *W.T. Grant Co. v. Owens*, 149 Va. 906, 921 (Va. 1928). Physical restraint is not necessary for a claim of false imprisonment; a "reasonable apprehension that force will be used unless [the plaintiff] willingly submits" is sufficient. *Zayre of Virginia, Inc. v. Gowdy*, 207 Va. 47, 51 (1966). Claims for false imprisonment under Virginia state law "frequently rise and fall with the reasonableness of the arrest/search underlying such claims." *Vollette v. Watson*, 937 F. Supp. 2d 706, 725-26 (E.D. Va. 2013) (collecting cases). Also, "the good faith of a defendant," even if accepted, is irrelevant. *Zayre*, at 51. For the same reasons a reasonable jury could find that Brooks unreasonably seized Amisi in violation of the Fourth Amendment, it could find she falsely imprisoned Amisi as well.

In arguing why she did not commit false imprisonment, Brooks repeats many of the factual misstatements from her section on the unreasonable search. ECF 64 at 20. Brooks states that no facts have been adduced to how Plaintiff feared force would be used against her if she tried to leave and that Plaintiff did not inform jail employees of her status as an employee until after the strip search. *Id*. These assertions are heavily disputed. Amisi testified that she told Brooks she would be "working for 12 hours" and asked her if "[y]ou have to search people who

work here?" Ex. 1 at 134:22-23; 136:13-14. Amisi also asked Brooks to leave and was told no. *Id*. at 139:1-7. She was told she could not even call her agency. *Id*. Brooks was "persistent and authoritative" in her demands. Ex. 1 at 139:16-19.  A jury could find that a reasonable person in that situation would believe they could not leave, especially when being addressed by a uniformed officer inside a secure facility, and that force might be used against her if she tried. The discrepancies between Amisi and Brooks's testimony cannot be reconciled here. If a jury finds Amisi to be more credible, it could find for her on the count of false imprisonment. Brooks's motion should thus be denied.

## 2. Plaintiff has adduced sufficient evidence for a jury to the decide the claim of intentional infliction of emotional distress.

A claim for intentional infliction of emotional distress contains four elements: [1] "the wrongdoer's conduct is intentional or reckless; [2] the conduct is outrageous and intolerable; [3] the alleged conduct and emotional distress are causally connected; [4] and the distress is severe." *Delk v. Columbia/HCA Healthcare Corp.*, 259 Va. 125, 136 (2000) (citing *Russo v. White*, 241 Va. 23, 26 (1991)).

Regarding the first element, the facts denoted in the preceding sections demonstrate that a jury could find Brooks's actions in strip searching Amisi were reckless. Amisi testified that Brooks ignored plentiful statements made by Amisi and the objective circumstances of their encounter in continuing her mistaken belief that Amisi was an inmate. While she may not have been intending to harm Amisi, Brooks acted recklessly towards her, satisfying the first element. Brooks's arguments to the contrary again rely on disputed facts that have previously been addressed. Such arguments are improper for this stage.

Concerning the second element, a strip search is an incredibly invasive procedure involving stripping naked in front of a stranger and being forced to contort oneself in front of

26

them so they can examine one's bodily cavities. Moreover, Amisi testified that she had to undergo this after being told she could not leave and that this would happen to her every day she worked at RRJ. Brooks's attempt to downplay this action by stating "Plaintiff tolerated the strip search, with a few surprised questions, but without a big reaction" is offensive and legally irrelevant. ECF 64 at 22. First, for the second element, the conduct at issue is Brooks's, not Amisi's. The severity of Amisi's reaction goes to the fourth element. Second, those few questions were, among other things, Amisi pleading with Brooks to let her leave, keep her clothing on, and keep the water bottle her daughter gave her. Ex. 1 at 134:17-143:13. A jury could certainly find that continuing to strip search Amisi in the face of such evidence is outrageous.

Causation cannot be argued by Brooks, leaving only the fourth element, the severity of Amisi's distress. Showing little understanding of trauma, Brooks argues that Amisi could not have been that distressed since she finished work that day, got a manicure after work, and completed her contract at the Jail. ECF 64 at 22. Amisi was sent home after the strip search, does not recall when she visited the nail salon on her bank statement, and testified about it being hard to complete her RRJ contract after the strip search. Ex. 1 at 170:19-23, 231:13-16; response to ¶ 70. Moreover, the fact that an at-the-time single mother continued to work at the only job she had does not mean she was not experiencing extreme distress.

Further, notwithstanding the foregoing, there is sufficient evidence on which a reasonable jury could find that Amisi suffered severe emotional distress due to the strip search. Amisi has been diagnosed with PTSD, been prescribed medication, and has had to undergo professional counseling. She suffers nightmares. She feels anxiety upon seeing police officers and military personnel. She is wary of people she does not know and feels safest in familiar settings. She fears traveling far from home alone. Amisi has had difficulty being intimate with her husband due to

shame and fear when taking off her clothes and being naked. Amisi has found it difficult to  engage

fully and normally with her husband and children. She often feels depressed, anxious, and fatigued.

Excerpts from Plaintiff's Answers to Townsend's Interrogatories, hereinafter Exhibit 6.

Additionally, contrary to Brooks's claims, Amisi's daughter testified that after the strip

search "my mom has been so depressed. She has had more anxiety.… She stays in her room most

of the time. She doesn't come out." Kamuchape Bwerevu Deposition, hereinafter Exhibit 7, at

56:3-12. Bwerevu further stated that "our relationships have changed because my mom is not as

energyic (sic) as she used to be and she kind of like shuts us off." *Id*. at 73:23-74:1. In all, the

record contains sufficient evidence for a jury to find that Brooks acted recklessly and intolerably

towards Amisi, causing her severe distress.

## V.    Conclusion

Relying on disputed material facts and an incomplete accounting of events, Brooks seeks

summary judgment on the theory that her mistake was reasonable. Amisi's claims against Brooks

are highly fact specific and cannot be resolved without a jury making credibility determinations

regarding the testimony of Amisi, Brooks, Townsend, Brown, and others. And there is sufficient

evidence for the jury to find in Amisi's favor. Against such a backdrop, summary judgment

cannot be granted.

WHEREFORE, Brooks' motion for summary judgment should be denied.


BIKACHI AMISI,

By:  _____ /s/ Daniel Zemel
                    Counsel

Mark J. Krudys (VSB# 30718)
Daniel Zemel (VSB# 95073)

28

THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone: (804) 774-7950
Fax:     (804) 381-4458
Email: mkrudys@krudys.com; dzemel@krudys.com
*Counsel for Plaintiff*

<u>**Certificate of Service**</u>

I hereby certify that on this 5th day of July 2021, I will electronically file the foregoing

with the Clerk of the Court using the CM/ECF system, which will then send notification of such

filing to the following:

Carlene Booth Johnson, Esq.
Perry Law Firm
A Professional Corporation
262 Chellowe Road
Dillwyn, Virginia 23936
perrylawfirm@hughes.net
*Counsel for Defendant Roy Townsend, Jr.*

William W. Tunner, Esq.
Matthew T. Anderson, Esq.
*Thompson*McMullan, P.C.
100 Shockoe Slip, Third Floor
Richmond, Virginia 23219
wtunner@t-mlaw.com
manderson@t-mlaw.com
*Counsel for Defendant Bryan Brown*

Alexander Francuzenko, Esq.
Philip Krone, Esq.
Thea Alicia Paolini, Esq.
Cook Craig & Francuzenko PLLC
3050 Chain Bridge Road, Suite 200
Fairfax, VA 22030
alex@cookcraig.com
pkrone@cookcraig.com
tpaolini@cookcraig.com
*Counsel for Defendant Lakeyta Brooks*

By:     <u>/s/ Daniel Zemel</u>
        Counsel

Daniel Zemel (VSB# 95073)
THE KRUDYS LAW FIRM, PLC
SunTrust Center
919 E. Main Street, Suite 2020
Richmond, VA  23219
Phone:   (804) 774-7950
Fax:   (804) 381-4458
Email: dzemel@krudys.com
*Counsel for Plaintiff*