IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

BIKACHI AMISI,
    Plaintiff,

    v.                                Civil No. 3:20cv218 (DJN)

RIVERSIDE REGIONAL JAIL
AUTHORITY, *et al.*,
    Defendants.

**MEMORANDUM OPINION**
**(Denying Defendants' Motions for Summary Judgment)**

Plaintiff Bikachi Amisi ("Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants Bryan Brown ("Brown"), Roy Townsend, Jr. ("Townsend") and Lakeyta Brooks ("Brooks") (collectively, "Defendants"), alleging that Defendants violated her constitutional rights by subjecting her to a strip search as she entered Riverside Regional Jail ("RRJ" or the "Jail") on her first day working as a nurse for the Jail's healthcare contractor. The Court dismissed Plaintiff's negligence and negligent infliction of emotional distress claims at the motion to dismiss stage. (ECF No. 28.) Plaintiff's state law claims for gross negligence, willful and wanton negligence, false imprisonment and intentional infliction of emotional distress ("IIED"), as well as Plaintiff's Fourth and Fourteenth Amendment claims remain.

This matter now comes before the Court on the Motions for Summary Judgment (ECF Nos. 56, 63, 66) filed by Townsend, Brooks and Brown. For the reasons set forth below, the Court DENIES Defendants' Motions in their entirety.

## I.     BACKGROUND

### A.     Undisputed Factual Background

While the parties' versions of what occurred on September 5, 2019, differ in several material respects, the basic facts of Plaintiff's claims prove largely undisputed.  The Court will recount these facts before endeavoring to detail the ways in which the parties' accounts of events diverge.

### A.     Undisputed Factual Background

On the morning of September 5, 2019, Plaintiff reported to RRJ to begin her orientation as part of an eight-week assignment as a nurse at the facility, working on behalf of Accountable, a healthcare staffing agency that staffed the Jail's medical contractor.  (Amisi Dep. (ECF Nos. 57-23, 64-1, 67-3, 79-1) at 100:2-23, 114:8-12, 201:1-4.)  When Plaintiff arrived at RRJ, she had difficulty navigating the complex and did not know where to park or which building to enter.  (Amisi Dep. at 119:3-120:1.)  While in one of RRJ's parking lots, Plaintiff encountered Defendant Brown, a sergeant at RRJ, and requested assistance.  (Amisi Dep. at 120:16-22; Brown Aff. (ECF No. 67-1) at ¶¶ 1, 8.)  Brown directed Plaintiff to a parking lot and instructed her to enter a nearby building through the back of the building.  (Amisi Dep. at 123:11-14.)  Plaintiff parked and approached the identified building.  (Amisi Dep. at 124:11.)  Plaintiff was wearing black scrubs and carrying a water bottle and her lunch at that time.  (Townsend Dep. (ECF Nos. 57-22, 64-2, 79-2) at 213:21, 234:4-23; Brown Dep. (ECF Nos. 57-24, 64-3, 67-2, 79-4) at 78:9-11, 115:6-13.)

Unbeknownst to Plaintiff, Brown had directed her to the Pre-Release Center at RRJ, a building separate from the main entrance to RRJ.  (Brown Aff. at ¶ 4.)  The Pre-Release Center, also known as Housing Unit 6, normally houses inmates serving non-continuous jail sentences.

(Brown Aff. at ¶ 5.)  Jail staff refer to these inmates as "weekenders" or "weekend inmates." (Brown Aff. at ¶ 5.)  The only orientation that occurred in the Pre-Release Center constituted orientation for weekenders or "weekender orientation."  (Brown Dep. at 44:14-20; Brown Aff. at ¶ 9.)  Nurse orientation occurred in the main jail.  (Brown Dep. at 55:13-17, 56:1-3; Rose Dep. (ECF Nos. 57-27, 64-5, 67-6, 79-19) at 89:3-6.)

When a weekender arrives at the jail for orientation, they must undergo the Jail's inmate intake process.  (Townsend Dep. at 63:7-23.)  This process involves both a strip search and a pat down search.  (Townsend Dep. at 63:7-23.)  An officer of the same gender as the incoming inmate conducts the strip search.  (Brooks Dep. at 68:21-25.)  The Jail typically seizes any personal property carried by the incoming inmate into the Jail, and either disposes of the property or puts it into a property bag.  (Townsend Dep. at 12-16.)

Instead of entering the Pre-Release Center through the back door as instructed by Brown, Plaintiff entered the building through the front door, which opened into the building's lobby. (Amisi Dep. at 124:11.)  Upon entering the building, Plaintiff again encountered Brown who had also entered the building.  (Amisi Dep. at 124:15-20; Brown Dep. at 83:22-84:5, 101:1-10, 104:17-20.)  The two conversed.  (Amisi Dep. at 124:21-25; Brown Dep. at 83:22-84:5, 107:15-25.)  Brown again directed Plaintiff to exit the building and reenter through the back door. (Amisi Dep. at 124:21-25.)  At this time, Brown also took over the position of "Primary Control" from Defendant Brooks, while Brooks proceeded to the Pre-Release Center's intake area to perform intake procedures for an incoming female inmate.  (Brown Dep. at 119:11-17, 170:15-17; Brooks Dep. at 64:21-65:13.)

Plaintiff complied with Brown's directive and went to the door at the back of the Pre-Release Center, SP6.  (Amisi Dep. at 125:18-126:2.)  This entrance to the Pre-Release Center

3

serves as the inmate intake entrance. (Brown Aff. at ¶ 6.) The entrance consists of two doors on either side of a sallyport — SP6, the outer door, which Primary Control locks and controls from an area adjacent to the lobby, and SP5, the inner door, which is locked and controlled by the Intake Officer stationed just inside the SP5 door. (Brown Aff. at ¶ 6.) A jail policy exists that requires the Primary Control officer who accepts an inmate via the SP6 door to verify that the inmate is a weekender before allowing their entrance into the sallyport. (Brown Dep. at 170:18-171:24; "Jail Policy" (ECF No. 92-12) at 2.) Plaintiff rang the buzzer outside SP6, walked through SP6 and proceeded into the sallyport. (Amisi Dep. at 126:7-21.)

Once inside the intake area, Plaintiff encountered Defendant Townsend, the Intake Officer in the Pre-Release Center that day. (Amisi Dep. at 126-127; Townsend Dep. at 176, 215:4-8.) Townsend communicated to Plaintiff that she should take a seat in the intake area. (Amisi Dep. 128:17-19; Townsend Dep. at 204.)

Another jail policy exists regarding RRJ's policy and procedures for accepting Pre-Release Center intakes. This policy states:

> Prior to accepting custody of an inmate, staff determines that the inmate is legally committed to the facility, and that the inmate is not in need of immediate medical attention (2A19). The Pre-Release Staff will verify all documentation of the reporting FBOP and Weekenders before accepting any intakes to be housed in the Pre-Release Center prior to being admitted. Staff will take all necessary steps to verify the reporting individual is ordered and scheduled to report to the Pre-Release Center as FBOP or Weekender.

(Jail Policy at 1.) Ordinarily, Weekend Coordinator Nichole Roney would organize a group of files for people that RRJ anticipated would come for weekender orientation on a particular day. (Brown Dep. at 64-65; Brooks Dep. at 90:20-25, 117-18; Townsend Dep. at 71, 109:24-25, 110:1-6, 126, 178; Roney Dep. (ECF Nos. 57-26, 64-6, 79-13) at 60-64, 80-83, 87-91.) However, sometimes individuals would arrive at the jail on the wrong day, or the court would be

4

delayed in sending paperwork to the jail. (Roney Dep. at 81:7-83:11.) Roney would regularly attempt to accommodate these individuals by allowing them to participate in their orientation despite their absence on the Jail's schedule. (Roney Dep. at 81:7-83:11.)

No such file existed for Plaintiff among the files that Townsend had. (Townsend Dep. at 179-82, 199-200; Roney Dep. 92:23-25, 93:1, 94.) Townsend attempted to call Roney to verify Plaintiff's status. (Townsend Dep. at 179-82, 199-200; Roney Dep. at 92:23-25, 93:1, 94.) From where she sat, Plaintiff could not observe these efforts and otherwise did not know what Townsend was doing. (Amisi Dep. at 130.)

When Roney answered Townsend's call, Townsend communicated to her that Plaintiff had arrived for weekender orientation, but that he did not have a file for her. (Roney Dep. at 94:12-16, 98:24-99:12.) He asked whether Roney had paperwork for Plaintiff. (Roney Dep. at 100:4-101:6.) Roney determined that she did not have any paperwork either. (Roney Dep. at 101, 114-15, 140-41; Townsend Dep. at 79, 239-40.) Roney communicated to Townsend that she would come to intake to speak with Plaintiff. (Roney Dep. at 102:4-15, 116:9; Townsend Dep. at 94, 102, 240.)

While Plaintiff waited in the intake area, Defendant Brooks entered the intake area from the adjoining female locker room, after completing a search of the incoming female inmate. (Amisi Dep. at 131:10-13; Brooks Dep. at 140:14.) Brooks indicated to Plaintiff that Plaintiff should follow her into the locker room. (Brooks Dep. at 179:12-23; Amisi Dep. at 132:1013.) Plaintiff went with Brooks into the locker room. (Brooks Dep. at 179-80; Amisi Dep. at 133:13-15.)

Plaintiff then underwent the same inmate intake procedure as an incoming weekender, despite her actual status as an employee working at the jail. Specifically, Brooks performed a

complete strip search of Plaintiff. (Amisi Dep. at 143:4-6, 20-22, 23-24.) Brooks and Plaintiff discussed the fact that Plaintiff had food and a water bottle with her and that the jail did not allow this. (Amisi Dep. at 134-35; Brooks Dep. at 181:20-25.) Brooks directed Plaintiff to throw away the food. (Amisi Dep. at 134-35; Brooks Dep. at 181:20-25.) After Brooks completed the strip search, Brooks instructed Plaintiff to redress and then performed a pat down search of Plaintiff in the intake area. (Amisi Dep. at 146-47:24-3; Brooks Dep. at 213:7-10.) Plaintiff was then asked to take a seat again. (Amisi Dep. at 150:14-22.)

After some time, Roney eventually arrived in the intake area to speak to Plaintiff. (Roney Dep. at 116:5-25.) Roney asked Plaintiff who had sent her to the jail, and Plaintiff responded that Accountable had sent her. (Amisi Dep. at 152-153:25-5; Roney Dep. at 109:15-19.) At this point, Roney contacted a nurse, who confirmed that Plaintiff was actually supposed to be in the main jail for nurse's orientation. (Roney Dep. at 111:2-8.) The nurse then came to the Pre-Release Center and instructed Plaintiff to proceed to the front of the Pre-Release Center, which Plaintiff did. (Amisi Dep. at 159:5-14.)

Based on these events, Plaintiff asserts claims of gross negligence against Brown, Townsend and Brooks, in addition to a willful and wanton negligence claim, IIED claim, false imprisonment claim and a Fourth/Fourteenth Amendment claim against only Townsend and Brooks.

B.     **Disputed Material Facts**

Despite the parties' agreement as to this basic timeline of events, the parties disagree as to several important facts. Importantly, Defendants' stories not only conflict with that of Plaintiff, but also with those of one another. The Court will review the disputed facts as they pertain to each Defendant's involvement in this incident.

6

###### 1.     *Disputed Facts: Brown*

Plaintiff's characterization of her interaction with Brown differs in several material ways from the characterization proffered by Brown.  First, they disagree as to the clarity with which Plaintiff informed Brown that she had arrived for her first day of work as a nurse at RRJ, and not as an inmate there to serve time as a weekender.  Plaintiff claims that when she approached Brown outside of the Pre-Release Center she told him that:  "I was a nurse and today was my first day for orientation.  And I don't know where to park and where I should go to meet Ms. Marshall.  But I don't know her name then. . . .  I said I was a nurse and today was my first time to work and it's my orientation day . . . ."  (Amisi Dep. at 122-23:23-9.)  Brown remembers only that Plaintiff stated that she had arrived at the RRJ for orientation, without ever specifying that she was there for *nurse* orientation.  (Brown Aff. (ECF No. 67-1.) ¶ 8.)  Further, Brown claims that he "asked Plaintiff if she was there for weekender orientation, and she said yes."  (Brown Aff. ¶ 10.)  Only after this clarification does Brown contend that he sent Plaintiff to the inmate entrance of the Pre-Release Center.  (Brown Aff. ¶ 10.)  However, Plaintiff maintains that she "never heard the word 'weekender' until later after the incident."  (Amisi Dep. at 123:20-21.)

Second, Plaintiff and Brown diverge as to their characterization of the interaction that occurred between them after Plaintiff entered the lobby of the Pre-Release Center.  According to Brown, when Plaintiff entered the lobby, he asked Plaintiff twice to confirm that she was at the Pre-Release Center for weekender orientation, and Plaintiff answered affirmatively both times. (Brown Dep. at 83:22-84:5; Rose Dep. at 47:14-48:11, 49:12-17, 56:11-12, 64:23-65:1, 214:24-215:9.)  Lieutenant Linda Rose ("Rose") recalls being in the area for this conversation as well. (Rose Dep. at 49:15-17.)

7

However, as stated, Plaintiff contends that she "never heard the word 'weekender' until later after the incident," and denies that Brown asked her if she had arrived at the jail for "weekender orientation" at any point during their interactions. (Amisi Dep. at 123:20-21, 125:1-8.) She also disputes that she saw anyone else in the lobby besides Brown. (Amisi Dep. at 245:6-10.) Plaintiff maintains that when she entered the lobby of the Pre-Release Center, Brown directed her to go around the building to get buzzed in, without reconfirming that she constituted an inmate. (Amisi Dep. at 124:15-25.) Specifically, she recounts that he stated: "I told you to go around the building, not come here. Go around the building and just buzz and they're going to open for you." (Amisi Dep. at 124:22-25.)

Additionally, Brooks' testimony provides that when Brown took over Primary Control from her, he told her that he had a "weekender for orientation." (Brooks Dep. at 119:10-12.) Brooks claims that Brown asked her to go to the back of the Pre-Release Center to the intake area, because he had "sent a lady around for weekender orientation" and to "get her while I was back there." (Brooks Dep. at 120:5-9.) Brown mentions that he informed Brooks of his encounter with Plaintiff in the parking lot but does not specify exactly what he said to Brooks. (Brown Dep. at 114:17-25.)

An evidentiary dispute also exists regarding the clarity of the signs and labels on the Pre-Release Center. Brown claims that "RRJ's main entrance is clearly marked and directly adjacent to the parking lot [and that t]he Pre-Release Center is also clearly marked as such." (Brown Aff. at ¶ 4.) Plaintiff disputes this conclusory characterization by pointing to Brown's testimony that no signs existed telling employees where to go for orientation, Brook's testimony that numerous people have stopped her in the jail's parking lot after accidentally coming to the Pre-Release Center when they intended to go to the main jail to visit family members and Townsend's

8

testimony that no signage existed in the Center's main parking lot.  (Brown Dep. at 85:23-96:2; Brooks Dep. at 138:5-10; Townsend Dep. at 78:6-11.)

Relatedly, Brown claims that a sign exists beside the SP6 door that states:  "INMATE INTAKE ONLY ALL VISITORS PLEASE REPORT TO LOBBY ON THE OPPOSITE SIDE OF THE BUILDING."  (Brown Aff. at Ex. C.)  Plaintiff challenges whether this sign appeared the same on September 5, 2019, as it did when the photograph of the sign depicted in Exhibit C to Brown's Affidavit was taken.  (Pl.'s Resp. in Opp'n to Brown's Mot. for Summ. J. ("Pl.'s Brown Resp.") (ECF No. 92) at 5.)  She notes that none of the contemporaneous statements about the incident contain a mention of this sign.  (Pl.'s Brown Resp. at 5.)

A factual question also exists as to who opened the secure SP6 door for Plaintiff.  Brown testifies that he did not open the SP6 door for Plaintiff.  (Brown Dep. at 90:4-6.)  He claims that Brooks later told him that she had opened the door for another inmate earlier, and that the inmate must have left the door open and unsecured.  (Brown Dep. at 90:8-1.)  However, Brooks avers that she did not open the door on the date in question, and has no understanding as to who opened the door.  (Brooks Dep. at 45:20-46:7.)  Both Brown and Brooks agree that Brown had taken over Primary Control when Plaintiff arrived at the inmate entry door and that Primary Control normally unlocks this door.  (Brown Dep. at 119:11-17, 170:15-17; Brooks Dep. at 64:21-65:13.)  And, Plaintiff testifies that the SP6 door was locked and closed when she first approached the door, but that it opened after she buzzed.  (Amisi Dep. at 126:1-25.)

Finally, a question exists as to whether Brown knew that he needed to verify the paperwork of every individual before opening the SP6 door to them and letting them into the building.  Brown avers that the Weekend Coordinator told him to allow individuals to enter the secure intake even if the Jail lacked paperwork on them, so that the Coordinator could attempt to

9

verify their identity by calling the court that had sent them.  (Brown Dep. at 64:10-65:13.)

However, Brown also acknowledges a jail policy that requires the Primary Control officer who

accepts an inmate via the SP6 door to verify that the inmate is a weekender before allowing their

entrance into the sallyport.  (Brown Dep. at 170:18-171:24.)  Lieutenant Lisa Rose, another

employee at the jail, testified that Brown, Brooks and Townsend all admitted that they knew that

they were required "to check with weekender orientation paperwork that was in intake to verify

that [an individual arriving at the jail] should have been a weekender and that should have been

done prior to [that person] being allowed through the SP6 door."  (Rose Dep. at 118:9-119:10.)

### 2. *Disputed Facts: Townsend*

A dispute also exists among the parties as to Townsend's role in this incident.  According

to Townsend, when Plaintiff entered the intake area through the SP5 door, he asked her multiple

times to clarify that she was there for weekender orientation.  (Townsend Dep. at 189:7-190:12.)

He claims that he then asked her to have a seat so that he could check his files and verify her

purpose for being at RRJ that day.  (Townsend Dep. at 190:14-17; 203:12-19, 204:12-15.)

Townsend states that he went behind the intake desk to check his files of inmates arriving for

orientation that weekend to find Plaintiff's name.  (Townsend Decl. at ¶¶ 3f, 3g, 3h; Townsend

Dep. 130:10-131:17, 207:7-16.)  When he could not find a file for Plaintiff, Townsend testifies

that he attempted to call Roney "several times" before she answered.  (Townsend Dep. at 237:7-

14; 239:20-25.)  After Roney confirmed that she would come to the Pre-Release Center to speak

with Plaintiff, Townsend claims that he became occupied in another task and did not see Brooks

and Plaintiff go into the locker room together.  (Townsend Dep. at 243:8-23.)

Townsend avers that the next time that he looked up from his work, he realized that

Plaintiff was no longer seated in the intake area.  (Townsend Dep. at 215:10-15.)  He testifies

10

Case 3:20-cv-00218-DJN  Document 109  Filed 08/16/21  Page 11 of 45 PageID# 4936

that right around this same time, Brooks asked him if they held food for inmates, and he responded that, as a general practice, they do not. (Townsend Dep. at 215:13-20.) Brooks apparently also asked him whether they could hold a water bottle "for somebody." (Townsend Dep. at 215:20.) Townsend testified that he "didn't know who [that somebody] was or where she was" and that he had "no idea" what Brooks had done. (Townsend Dep. at 215:22-216:1.) While Townsend claims that he could not see or hear into the female locker room when Plaintiff and Brooks were in there, Plaintiff contends that this is a jury question given Townsend's close proximity to the room. (Townsend Dep. 204-04, 216-18.)

Conversely, Plaintiff contends that when she entered the intake area from the sallyport, she greeted Townsend and "said that I was a nurse and . . . today would be my first day to work there. And this is my orientation day, that I have an appointment with Ms. Marshall." (Amisi Dep. at 128:10-14.) She stated that Townsend "just pointed and asked me to sit and wait at the chair there" and never explained that he planned to verify her purpose in being there. (Amisi Dep. at 128:17-19.)

Plaintiff never saw Townsend on the phone, but claims that while she waited, Brooks entered the intake area from the locker room and spoke to Townsend. (Amisi Dep. at 131:16-19.) Plaintiff could not hear the content of their conversation, but she observed Townsend point at her during his conversation with Brooks. (Amisi Dep. at 131:19-20.) Brooks then approached Plaintiff and told Plaintiff to follow her. (Amisi Dep. at 131:20-21.)

According to Brooks, when Brooks entered the intake area, she asked both Plaintiff and Townsend whether Plaintiff was there for weekender orientation. (Brooks Dep. at 168:18-24, 179:12-23.) Brooks testified that Townsend gestured to Plaintiff and stated: "the weekender for orientation is sitting on the bench." (Brooks Dep. at 168:12-14.) Additionally, Brooks contends

11

that Townsend was "right there" when she instructed Plaintiff to follow her into the locker room, and otherwise never told her to stop or wait until Roney arrived to confirm whether they had any paperwork for Plaintiff. (Brooks Dep. at 215:16-216:8.) Brooks also testified that during the search of Plaintiff, she paused the search to ask Townsend whether Plaintiff could keep her food with her, and Townsend responded that Plaintiff had to throw the food away. (Brooks Dep. at 181:13-21.) Brooks stated that Townsend also took Plaintiff's water bottle and held it at the intake desk. (Brooks Dep. at 181:20-25.)

### 3. *Disputed Facts: Brooks*

Finally, the parties dispute the exact nature of Brooks' role in this incident. Brooks testified that when she entered the intake area, she pointed at Plaintiff and asked Townsend whether Plaintiff was the female weekender there for orientation, and Townsend responded "yes." (Brooks Dep. at 168:11-19; 179:12-23.) As stated, Townsend contests this. Brooks also claims that she asked Plaintiff the same, and Plaintiff responded "yes." (Brooks Dep. at 168:18-19; 179:12-23.) Brooks claims that she asked Plaintiff the same question again as they entered the locker room, and Plaintiff again responded affirmatively. (Brooks Dep. at 177:5-20.)

When they entered the locker room together, Brooks testified that she asked Plaintiff "how many weekends was she doing" and Plaintiff responded "eight." (Brooks Dep. at 7-9.) Brooks also stated that Plaintiff asked Brooks "do nurses do this? Y'all have nurses that work here, too?" (regarding the strip search), and Brooks informed Plaintiff that all types of people come to serve weekend time and are subject to a strip search. (Brooks Dep. at 181:1-6.)

Plaintiff recounts her interactions with Brooks differently. Plaintiff testified that when Brooks approached her in the intake area, Brooks just asked Plaintiff to follow her into the locker room. (Amisi Dep. at 122:12-13.) Plaintiff stated that she believed Brooks was taking her to her

orientation. (Amisi Dep. at 11-14.) When they entered the locker room, Brooks informed her that Plaintiff could not bring food into the jail with her, and Plaintiff recalled asking Brooks: "Why I shouldn't bring food? I will be working for 12 hours" and "Maybe I can keep it and at the end of the day when I leave, I can take it home with me." (Amisi Dep. at 134:22-23, 135:14-16.) Plaintiff also testified that she repeatedly stated that she did not know food would be provided by the jail. (Amisi Dep. at 134:23-24, 135:10-11.) Specifically, she stated: "They didn't tell me that they were going to be feeding us . . . the agency didn't tell me." (Amisi Dep. at 135:10-12.)

Additionally, when Brooks commanded Plaintiff to remove her clothes, Plaintiff claims that she responded, "Why should I take my clothes off?" (Amisi Dep. at 136:7-8.) When Brooks responded that Plaintiff was subject to a search, Plaintiff replied, "You have to search people who work here?" and Brooks responded in the affirmative. (Amisi Dep. at 136:13-15.) Plaintiff claims that she again questioned Brooks saying, "I am a nurse and I'll be working here. Which means every day I come here, I have to take my clothes off?" and Brooks responded "Yes." (Amisi Dep. at 136:18-21.)

Plaintiff also stated that she asked Brooks if she could go call her agency and tell them about the search, explaining that if she had known about the search "I couldn't accept to come here." (Amisi Dep. at 138:19-22.) According to Plaintiff, Brooks refused to allow her to leave to make the call, saying, "once you in, you can't go out. And you can't call them. You have to take your clothes off." (Amisi Dep. at 139:1-7.) During this time, Plaintiff described Brooks as acting "persistent and authoritative." (Amisi Dep. at 139:16.) According to Plaintiff, she threw away her food at the end of the search, because Brooks directed her to do so. (Amisi Dep. at 143:8-10.)

Rose also testified that Brooks had an obligation to check the jail's documentation herself to ensure that Plaintiff's name was on the weekender orientation list before escorting Plaintiff into the locker room. (Rose Dep. at 144:9-25, 148:19-24.) Brown testified to the same, stating that Brooks had a duty to find Plaintiff's file, and if she could not, to contact the Weekender Coordinator before initiating a strip search. (Brown Dep. at 164:20-25.) Brooks makes little mention of this policy or her duty to verify Plaintiff's status.

### C.    Defendants' Motions for Summary Judgment

#### 1.    Townsend's Motion

On June 18, 2021, Townsend filed his Motion for Summary Judgment (ECF No. 56). In support of his Motion, Townsend argues that the evidences shows that Townsend did not act with either gross negligence or willful and wanton negligence. (Townsend's Mem. in Supp. of Mot. Summ. J. ("Townsend's Mem.") (ECF No. 57) at 18-21.) Relatedly, Townsend maintains that Plaintiff's IIED claim must be dismissed, because the evidence does not establish "intentional" or "reckless" action on his part. (Townsend's Mem. at 22-23.) Further, he argues that Plaintiff can neither show that his acts were sufficiently "outrageous" to meet the second element, nor that his actions caused the emotional distress that allegedly resulted from the strip search. (Townsend's Mem. at 22-23.)

Additionally, Townsend contends that the evidence shows no false imprisonment by him, because he did not restrain Plaintiff, use any force or threaten her during their relevant interactions. (Townsend's Mem. at 21-22.) For similar reasons, Townsend maintains that Plaintiff's constitutional claims must fail. (Townsend's Mem. at 23.) Specifically, he posits that his actions did not amount to a search or seizure of Plaintiff, let alone an *unreasonable* search or seizure. (Townsend's Mem. at 23-25.) Rather, he asks the Court to find that the encounter

14

between Plaintiff and Townsend was entirely consensual, and therefore beyond the reach of the Fourth Amendment. (Townsend's Mem. at 24.)

Finally, Townsend renews two arguments from his original Motion to Dismiss. First, he contends that both good faith immunity bars Plaintiff's state law claims, and qualified immunity applies to protect him from liability on the federal claims. (Townsend's Mem. at 26, 29.) Second, he asks the Court to reconsider its conclusion that the Virginia Workers' Compensation Act's ("VWCA") exclusivity provision does not apply to bar Plaintiff's claims. (Townsend's Mem. at 27-28.)

On July 2, 2021, Plaintiff filed her Memorandum in Opposition to Townsend's Motion for Summary Judgment, (Pl.'s Resp. in Opp'n to Townsend's Mot. for Summ. J. ("Pl.'s Townsend Resp.") (ECF No. 79)), and, on July 8, 2021, Townsend filed his Reply, (Reply Br. in Supp. of Townsend's Mot. for Summ. J. ("Townsend's Reply") (ECF No. 93)), rendering the matter now ripe for review.

### 2.   *Brooks' Motion*

On June 21, 2021, Brooks filed her Motion for Summary Judgment (ECF No. 63). In support of her Motion, Brooks raises arguments similar to those of Townsend. First, she contends that the VWCA's exclusivity provision bars Plaintiff's claims. (Brooks' Mem. in Supp. of Mot. Summ. J. ("Brooks' Mem.") (ECF No. 64) at 11.) Next, she argues that Plaintiff cannot establish negligence — either gross or willful and wanton — as a matter of law. (Brooks' Mem. at 16-19.) Relatedly, Brooks argues that the IIED claim fails, because no facts show that her conduct proved intentional or reckless. (Brooks' Mem. at 21.) And, similarly, she avers that the facts do not show that her conduct was outrageous or intolerable. (Brooks' Mem. at 21.)

15

Brooks also maintains that Plaintiff's false imprisonment claim must fail, because Plaintiff willingly entered the jail of her own volition and never sufficiently elucidated her true purpose in entering the jail. (Brooks' Mem. at 20.) Per Brooks, Plaintiff's "liberty was entirely in her own hands for the duration of her time while she was in the Pre-Release area." (Brooks' Mem. at 20.)

Brooks also asserts a qualified immunity defense as to the § 1983 claims, and argues that she did not subject Plaintiff to an unreasonable seizure, because Plaintiff never adequately clarified her status as an employee and not an inmate. (Brooks' Mem. at 22-26.) Additionally, Brooks maintains that her search of Plaintiff was reasonable, based on Brooks' claim that "Brooks was told by her supervisor Defendant Brown to 'get' the weekender in while she was in the intake area of the jail, and Plaintiff was then confirmed to be that weekender by both Defendant Townsend and Plaintiff herself." (Brooks' Mem. at 28.)

On July 5, 2021, Plaintiff filed her Memorandum in Opposition to Brooks' Motion for Summary Judgment, (Pl.'s Resp. in Opp'n to Brooks' Mot. for Summ. J. ("Pl.'s Brooks Resp.") (ECF No. 91)), and, on July 16, 2021, Brooks filed her Reply, (Reply Br. in Supp. of Brooks' Mot. for Summ. J. ("Brooks' Reply") (ECF No. 100)), rendering the matter now ripe for review.

### 3.    *Brown's Motion*

On June 21, 2021, Brown filed his Motion for Summary Judgment (ECF No. 66). Brown argues that the facts fail to support the only claim remaining against him — a state law claim for gross negligence. (Brown's Mem. in Supp. of Mot. Summ. J. ("Brown's Mem.") (ECF No. 67) at 9.) Brown also contends that Virginia's good faith immunity doctrine protects him from liability and, alternatively, that Plaintiff's own contributory negligence causes her claim to fail as a matter of law. (Brown's Mem. at 11-12.) Finally, Brown reasserts his arguments as to the

16

VWCA, and asks the Court to reconsider its previous rulings as to this issue. (Brown's Mem. at 14.)

On July 5, 2021, Plaintiff filed her Memorandum in Opposition to Brown's Motion for Summary Judgment and, on July 12, 2021, Brown filed his Reply, (Reply Br. in Supp. of Brown's Mot. for Summ. J. ("Brown's Reply") (ECF No. 95)), rendering the matter now ripe for review.

## II.      STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The relevant inquiry in a summary judgment analysis focuses on "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In reviewing a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party. *Id.* at 255. Moreover, the Court cannot weigh the evidence to enter a judgment, but simply must determine whether a genuine issue for trial exists. *Greater Balt. Ctr. For Pregnancy Concerns v. Mayor of Baltimore*, 721 F.3d 264, 283 (4th Cir. 2013).

Once the moving party properly submits and supports a motion for summary judgment, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; instead, there must be no genuine issue of material fact. *Anderson*, 477 U.S. at 247-48. "Only disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment." *Id.*

## III.   ANALYSIS

Because Defendants and Plaintiff each offer differing accounts of what occurred on September 5, 2019, and these differing accounts make it difficult to determine the culpability of each party for Plaintiff's injuries, summary judgment proves unsuitable at this time on the majority of Plaintiff's claims. However, the Court will address each of Defendants' arguments in turn.

### A.   VWCA Exclusivity Arguments

Defendants ask the Court to reopen its decision regarding the VWCA's exclusivity provision and find that it bars Plaintiff's claims. (Townsend's Mem. at 27-28; Brown's Mem. at 14-16; Brooks' Mem. at 11-16.) Specifically, Defendants contend that the evidence supports a finding that Plaintiff's injury "arose out of" her employment. (Townsend's Mem. at 27-28; Brown's Mem. at 14-16; Brooks' Mem. at 11-16.)

Because Defendants have supplied no new contradictory authority or evidence that supports their positions on this issue, the Court finds Defendants' renewed arguments unpersuasive. And so, for the same reasons the Court previously gave when it addressed this issue, the Court finds that the VWCA's exclusivity provision does not bar Plaintiff's state law claims. *See Amisi v. Riverside Reg'l Jail Auth.*, 469 F. Supp. 3d 545, 563-64 (E.D. Va. 2020) (discussing VWCA's exclusivity provision). Specifically, applying the "actual risk standard," Plaintiff's subjection to the same intake procedures as weekender inmates did not constitute a risk peculiar to Plaintiff's employment. *Id.* at 563. While Plaintiff would certainly not have attempted to enter the Jail on the day in question but for her employment, no rational causation

18

exists between Plaintiff's employment as a nurse at the Jail and the risk of correctional officers subjecting her to inmate intake procedures. *Id.*

Defendants' discussion of *Roberson v. Whetsell* does not alter this conclusion. (Brown Mem. at 14-15; Townsend's Mem. at 28.) In *Roberson*, a custodian was shot and killed in a crime-ridden area as he drove the direct route from his employer's office to the building where he worked. 463 S.E.2d 681, 682 (Va. Ct. App. 1995). Because the plaintiff, "as a condition of his employment," was required to make "repeated, regular trips" through a violent, crime-ridden area, the court upheld a finding that the plaintiff's risk of being shot was peculiar to his employment. *Id.* at 683-84. The court noted that the requisite causal nexus was supplied by a showing that the nature of the claimant's job augmented the probability of him being shot. *Id.* at 683.

Unlike in *Roberson*, Defendants have supplied no evidence that shows that Plaintiff's occupation as a nurse at the jail exposed her to a heightened risk of being subjected to the assault that she endured here. As stated by this Court already, Plaintiff's employment should have allowed her to avoid the exact hazards that caused her injuries, as nothing in the record establishes that Plaintiff's employment required her to enter the Pre-Release Center or submit to the intake procedures performed therein. In fact, Defendants have not provided any evidence that suggests that the jail would have subjected Plaintiff to *any* security measures as an employee, much less the highly invasive inmate intake procedures that she experienced here. While in *Roberson* a "condition of employment" included the claimant subjecting himself to the risk of being shot, the evidence here does not show that a condition of Plaintiff's employment included Plaintiff subjecting herself to a risk of being mistaken for an inmate and wrongfully strip searched.

19

For these reasons, the Court again finds that the VWCA's exclusivity provision does not bar Plaintiff's state law claims.

### B.    Negligence Claims

#### 1.    *Sufficient Evidence Exists to Support Plaintiff's Gross Negligence Claim Against Brown, Brooks and Townsend.*

Defendants contend that the evidence does not support a gross negligence claim against them. (Brown's Mem. at 9-11; Townsend's Mem. at 17-18; 19-20.)  Plaintiff responds that Defendants' arguments rely on heavily disputed, incomplete and mischaracterized versions of the facts and require the Court to make credibility determinations that prove improper at this stage. (Pl.'s Townsend Resp. at 26.; Pl's Brooks Resp. at 23.)  The Court agrees with Plaintiff.

Gross negligence denotes "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person." *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918 (Va. 2004).  Gross negligence "must be such a degree of negligence as would shock fair minded persons although something less than willful recklessness." *Ferguson v. Ferguson*, 181 S.E.2d 648, 653 (Va. 1971).  Adequate evidence exists to support a finding of gross negligence "when a defendant is aware of a danger, but fails to take any precautions to guard against that danger." *Caramillo v. Correct Care Sols., LLC*, 2020 WL 4747786, at *7 (E.D. Va. Feb. 28, 2020).

Notably, "[w]hether or not gross negligence has been proved depends on the facts and circumstances of each case," and "[i]t is often a difficult task to determine whether the facts and the reasonable inferences therefrom in a given case do or do not show gross negligence as a matter of law." *Wallower v. Martin*, 144 S.E.2d 289, 291 (Va. 1965).  However, "a claim for gross negligence must fail as a matter of law when the evidence shows that the defendants exercised some degree of care." *Elliott v. Carter*, 791 S.E.2d 730, 732 (Va. 2016).

20

As this Court has already determined, Defendants Brown and Townsend owed a duty of ordinary care to Plaintiff. *Amisi*, 469 F. Supp. 3d at 572-73. The Court will not revisit this threshold question in depth, except insofar as to conclude that Defendant Brooks also owed Plaintiff a duty of ordinary care for the same reasons stated in the Court's earlier Opinion. *Id.* The Court therefore turns to the question of whether each Defendant breached this duty.

### i. Brown

Viewing the record in a light most favorable to Plaintiff and resolving all factual disputes in her favor as the Court must do at this stage, sufficient evidence exist for a jury to find that Brown acted with gross negligence during his interaction with Plaintiff. According to Plaintiff, when she first approached Brown, she informed him that she was a nurse reporting for her first day of work and that she was looking for her orientation. Plaintiff avers that she never heard the word "weekender" on the day of the incident. Plaintiff wore nurse's scrubs and carried a water bottle and lunch.

Despite this information, Brown directed Plaintiff to the Pre-Release Center and its inmate entrance. Yet, when Plaintiff entered the main entrance of the Pre-Release Center as would an ordinary visitor, Brown again directed Plaintiff to exit the building and reenter through the inmate intake entrance without confirming her weekender status. And, according to Brooks, Brown told Brooks that he had "sent a lady around for weekender orientation" and to "get her" when Brooks entered the intake area.

Based on this evidence, a reasonable juror could find that Brown acted with complete neglect for Plaintiff's safety and well-being. Brown disregarded information communicated to him directly by Plaintiff that she constituted an employee of the jail and not an inmate. And, notwithstanding this information, Brown twice directed Plaintiff to the inmate entrance of the

21

Pre-Release Center. Additionally, while a factual dispute exists regarding the person responsible for opening the exterior SP6 door, a jury could reasonably infer from the evidence and testimony in the record that Brown opened the door for Plaintiff.

These facts could support a finding that Brown acted with gross negligence. Although Brown had knowledge that Plaintiff did not constitute a weekender inmate and otherwise did not verify that she was one in accordance with jail procedures, Brown allowed her to enter the secure door of the Jail. In so doing, Brown guaranteed that Plaintiff would attempt to enter the Jail as an inmate, despite the Jail having no legal authorization for assuming such authority over Plaintiff, and that Plaintiff would be exposed to the harms that she ultimately sustained.

Furthermore, a reasonable juror could credit Brooks' testimony that Brown told her to "get the weekender" to find that Brown affirmatively ensured the perpetuation of his initial mistake as to Plaintiff's identity and thus the subsequent assault that occurred. Indeed, Townsend's and Brooks' actions seemed to flow directly from Brown's initial disregard for Plaintiff's identifying statements. For these reasons, Plaintiff's gross negligence claim survives as to Brown.

### ii.    Townsend

Sufficient facts also exist in the record that could support a finding that Townsend acted with gross negligence. Townsend served as the intake officer on the day in question. As such, he admittedly bore the responsibility of ensuring that inmates entering the jail were legally committed to the facility. Plaintiff claims that when she entered the intake area she told Townsend "that I was a nurse and . . . today would be my first day to work there. And this is my orientation day, that I have an appointment with Ms. Marshall." (Amisi Dep. at 128:10-14.) Townsend admits that he had no documentation verifying Plaintiff's status as an inmate and that

22

he received no alternative confirmation from Roney when he called to check Plaintiff's status with her.

Despite Townsend's independent duty to verify Plaintiff's status and these three separate instances in which it should have been made clear to Townsend that Plaintiff was not legally committed to the facility, Brooks testifies that Townsend pointed to Plaintiff when Brooks entered the intake area and stated: "the weekender for orientation is sitting on the bench." (Brooks Dep. at 168:12-14.)  Townsend then allowed Brooks to take Plaintiff into the female locker room, knowing that Brooks would search Plaintiff therein and without waiting for Roney to arrive to confirm Plaintiff's identity.  Based on this testimony, a jury could reasonably conclude that Townsend implicitly authorized Brooks to take Plaintiff to the female locker room to undergo a highly invasive strip search, knowing that the jail had no legal authority to perform this search or any other inmate intake procedures.

Together, these facts, taken as true, and the inferences reasonably drawn therefrom, could support the conclusion that Townsend acted with an "utter disregard of prudence" during his encounter with Plaintiff such that his conduct "would shock fair minded persons."  Thus, the evidence plausibly establishes a gross negligence claim against Townsend.

### iii.    Brooks

Finally, sufficient facts exist in the record to support the conclusion that Brooks acted with gross negligence during her interaction with Plaintiff.  At several points during Plaintiff's and Brooks' conversation in the female locker room, Plaintiff stated that she was a nurse who had arrived at the jail for work.  Critically, Plaintiff claims that she said to Brooks, "I am a nurse and I'll be working here.  Which means every day I come here, I have to take my clothes off?" and Brooks responded "Yes." (Amisi Dep. at 136:18-21.)  Additionally, a reasonable juror could

23

find that Plaintiff made several comments from which Brooks should have known or inferred that Plaintiff did not constitute a weekender inmate. Specifically, Plaintiff claims that she asked Brooks, "Why I shouldn't bring food? I will be working for 12 hours" and "Maybe I can keep it and at the end of the day when I leave, I can take it home with me." (Amisi Dep. at 134:22-23, 135:14-16.) Plaintiff even asked Brooks for permission to leave the locker room so that she could call the agency that had sent her, a request that Brooks denied.

Despite having these clear indications that she did not have the legal authority to search Plaintiff, Brooks proceeded with the strip search. In so doing, Brooks exhibited a degree of indifference to Plaintiff's rights that amounted to a complete neglect for Plaintiff's safety. Therefore, viewing the facts and testimony in a light most favorable to Plaintiff, sufficient evidence exists in the record to support Plaintiff's gross negligence claim against Brown.

Importantly, Defendants disagree as to the question of whether anyone told Brooks that Plaintiff was a weekender. Brooks claims that both Townsend and Brown referred to Plaintiff as a weekender and that from these statements, she reasonably concluded that Plaintiff was legally committed to the jail before undertaking Plaintiff's strip search. Townsend denies this statement, and Brown does not mention it in his account of events. Because the reasonableness of Brooks' ensuing actions hinges in large part on which story the fact finder believes (and reasonable minds could differ on this issue), the question of whether Brooks acted with gross negligence must be resolved by a jury. As such, Defendants are not entitled to judgment as a matter of law at this stage.

### 2.   *Sufficient Evidence Exists to Support Plaintiff's Willful and Wanton Negligence Claim Against Brooks and Townsend.*

A claim of willful and wanton negligence requires that Defendants acted "consciously in disregard of another person's rights or . . . with reckless indifference to the consequences, with

the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another." *Etherton v. Doe*, 597 S.E.2d 87, 90 (Va. 2004) (internal quotations and citations omitted). Such conduct "generally involves some type of egregious conduct — conduct going beyond that which shocks fair-minded people." *Harris v. Harman*, 486 S.E.2d 99, 102 (Va. 1997). "[E]vidence that a defendant had prior knowledge or notice that his actions or omissions would likely cause injury to others is a significant factor in considering issues of willful and wanton negligence." *Alfonso v. Robinson*, 514 S.E.2d 615, 619 (Va. 1999). An actor guilty of such willful and wanton conduct "intends his act, but not the resulting harm." *Green v. Ingram*, 608 S.E.2d 917, 923 (Va. 2005) (internal quotations omitted). As with gross negligence claims, "[e]ach case raising an issue of willful and wanton negligence must be evaluated on its own facts." *Kaltman v. All Am. Pest Ctrl., Inc.*, 706 S.E.2d 864, 871 (Va. 2011).

A general failure to obey protocol, absent actual or constructive knowledge that the disobedience will probably result in harm proves insufficient to support a claim for willful and wanton negligence. *Green*, 608 S.E.2d at 924 (concluding that officer firing rounds into a door in violation of protocol did not support a finding of gross negligence absent evidence that the officer knew that someone was behind the door and would probably be harmed); *Keeling v. Correct Care Sols., LLC*, 2019 U.S. Dist. LEXIS 230903, at *9 (E.D. Va. Sept. 23, 2019) (finding that jail employees failure to follow protocol does not support a willful and wanton negligence claim against jail superintendent, absent evidence that superintendent knew about this failure or that this failure would probably result in harm to sick inmate).

### i.    Brooks

Viewing the evidence in a light most favorable to Plaintiff, Brooks' actions rise to such a level of reckless indifference to the consequences of her actions that a reasonable juror could find that Brooks acted with willful and wanton negligence.  Brooks knew that Brown had sent Plaintiff to the inmate entrance after Plaintiff first entered the lobby of the Pre-Release Center. The parties agree that Brooks next encountered Plaintiff in the inmate intake area, and that Plaintiff was seated where other incoming inmate would normally sit.  Plaintiff did not tell Brooks that she was a nurse when Brooks first directed Plaintiff to follow her into the locker room.  Up until this moment, Brooks' assumption that Plaintiff was an inmate did not rise to the level of willful and wanton negligence, even though (according to Rose) Brooks may have breached jail protocol by failing to independently verify Plaintiff's identity before bringing Plaintiff into the locker room.

However, according to Plaintiff's account of her conversation with Brooks once they entered the locker room, Plaintiff made numerous statements from which Brooks should have known that Plaintiff was not an inmate.  Specifically, Plaintiff recalls asking Brooks:  "Why I shouldn't bring food?  I will be working for 12 hours" and "Maybe I can keep it and at the end of the day when I leave, I can take it home with me."  (Amisi Dep. at 134:22-23, 135:14-16.) Additionally, when Brooks commanded Plaintiff to remove her clothes, Plaintiff claims that she responded, "Why should I take my clothes off?"  (Amisi Dep. at 136:7-8.)  When Brooks responded that Plaintiff was subject to a search, Plaintiff replied, "You have to search people who work here?" and Brooks responded in the affirmative.  (Amisi Dep. at 136:13-15.)  Plaintiff claims that she again questioned Brooks saying, "I am a nurse and I'll be working here.  Which

means every day I come here, I have to take my clothes off?" and Brooks responded "Yes." (Amisi Dep. at 136:18-21.)

These facts certainly could support a finding that Brooks acted consciously in disregard of Plaintiff's rights or with reckless indifference to the consequences of her actions. Indeed, Brooks should have been aware based on Plaintiff's statements that her conduct would have caused injury to Plaintiff, as Plaintiff made it clear that she did not constitute an inmate. For these reasons, the Court denies Brooks' Motion as to Count Three.

### ii.   Townsend

The record also supports a willful and wanton negligence claim against Townsend. Plaintiff states that when she greeted Townsend, she told him that she was a nurse there at the jail for her first day of work. Townsend did not have a folder in his possession or at the intake desk identifying Plaintiff as an inmate, and Townsend knew that he did not have such a folder. And, after speaking with Roney, Townsend received further confirmation that no file existed for Plaintiff that affirmed that Plaintiff constituted an inmate. In fact, Townsend knew that Roney had agreed to come to the Pre-Release Center to speak to Plaintiff to clarify Plaintiff's status and knew that Plaintiff should not undergo inmate intake procedures absent this verification. Thus, based on Townsend's "knowledge of existing circumstances and conditions," a jury could find that Townsend actually or constructively knew that the jail had no legal authorization to subject Plaintiff to inmate intake procedures and that subjecting her to inmate intake procedures absent this legal authorization would violate Plaintiff's rights.

A jury could also credit Brooks' testimony that Townsend told Brooks that Plaintiff was a weekender inmate and then allowed Brooks to escort Plaintiff into the female locker room where Townsend knew that Brooks performed strip searches of incoming inmates. A jury could

27

reasonably conclude that Townsend acted with willful or wanton negligence by communicating unconfirmed information to Brooks regarding Plaintiff's identity and then affirmatively authorizing Plaintiff's wrongful search by allowing Brooks to escort Plaintiff into the locker room in front of him. Consequently, the Court also denies Townsend's Motion as to Count Three.

### 3.    *The Defense of Contributory Negligence Does Not Bar Plaintiff's Claims at this Stage*

Defendant Brown argues that Plaintiff's negligence claim against him fails due to her own contributory negligence. (Brown's Mem. at 12.) Specifically, he contends that she ignored instructions from her employer by arriving at RRJ without any employee identification, ignored clear signs directing her where to go, failed to clarify that she had arrived at the jail for nurse's orientation and not weekender orientation, and then entered through a door clearly marked with an "inmate only" entrance sign. (Brown's Mem. at 13.)

"Contributory negligence is an affirmative defense that must be proved according to an objective standard whether the plaintiff failed to act as a reasonable person would have acted for his own safety under the circumstances." *Jenkins v. Pyles*, 611 S.E.2d 404, 407 (Va. 2005). For such negligence to bar recovery by a plaintiff, "the plaintiff's negligence must be concurrent with the defendant's negligence." *Ponirakis v. Choi*, 546 S.E.2d 707, 711 (Va. 2001). The question of whether a plaintiff "is guilty of contributory negligence is ordinarily a question of fact to be decided by the fact finder. The issue becomes one of law for the [ ] court to decide only when reasonable minds could not differ about what conclusion could be drawn from the evidence." *Rascher v. Friend*, 689 S.E.2d 661, 664 (Va. 2010).

The Court finds that Brown's argument relies on too many disputed facts to succeed at this stage. For example, while Brown contends that sufficient signage existed both in the jail

parking lot and at the back entrance of the jail such that Plaintiff should have known that she approached the wrong building and incorrect entrance, Plaintiff challenges this characterization and notes that no evidence exists that the relevant signs existed in the condition on the day in question as at the time that the pictures of the signs were taken.  She also points to other testimony in the record that suggests that other visitors to the jail also have struggled to navigate the complex.

Moreover, Plaintiff claims that she told Brown that she was a nurse and denies that Brown ever clarified her status with her.  Additionally, she claims that Accountable never gave her any identifying badge or other documentation to bring to the jail.  In fact, she states that Accountable told her that she would only need her driver's license and that the jail would be expecting her.

Because Brown's defense of contributory negligence relies almost entirely on disputed facts which prove material to this issue, the question of whether Plaintiff was contributorily negligent during her encounter with Brown proves a question better answered by a jury.  *See Va. Elec. & Power Co. v. Winesett*, 303 S.E.2d 868, 872 (Va. 1983) ("As a general rule, contributory negligence is a jury issue.").

### C.      Intentional Infliction of Emotional Distress Claim

Brooks and Townsend also challenge Plaintiff's IIED claim.  Specifically Brooks contends that no facts show that Brooks acted intentionally or recklessly by strip searching Plaintiff.  (Brooks' Mem. at 21.)  Specifically, she points to her own claim that when she asked Plaintiff and Townsend if Plaintiff had arrived for weekender orientation, they both responded "yes." (Brooks' Mem. at 21.)  Brooks also challenges whether the facts show that her conduct proved "outrageous" or "intolerable," pointing to her claims that she made numerous attempts to

29

verify that Plaintiff had arrived for weekender orientation and only then undertook an otherwise routine search.  (Brooks' Mem. at 22.)  Finally, Brooks maintains that Plaintiff has not demonstrated severe emotional distress as a result of the search.  (Brooks' Mem. at 22.)

Townsend proffers similar arguments.  Specifically, he contends that the evidence fails to show that he acted intentionally or recklessly, or that his conduct proves sufficiently outrageous.  (Townsend's Mem. at 22.)  He also challenges the causation element, arguing that any emotional distress suffered by Plaintiff did not result from any action taken by him.  (Townsend's Mem. at 23.)

"[A] claim for intentional infliction of severe emotional distress requires proof of [1] severe emotional distress [2] proximately caused by [3] a defendant's outrageous conduct that is [4] intentional or reckless."  *Almy v. Grisham*, 639 S.E.2d 182, 189 (Va. 2007) (citations omitted).  Generally, IIED claims are "'not favored' in the law," because "the conduct cannot be defined objectively [and] clear guidance is lacking."  *Id.* at 187.

### 1.  *Brooks*

For reasons similar to those supporting the willful and wanton negligence claim against Brooks, the IIED claim against her also survives.  In deciding Plaintiff's willful and wanton claim, the Court has already determined that the record could support a finding that Brooks acted with the degree of recklessness or intentionality required for an IIED claim by continuing with Plaintiff's strip search despite possessing knowledge that Plaintiff did not constitute an inmate.  Additionally, a jury could reasonably find that continuing to strip search an innocent citizen, knowing that no legal authorization existed to perform the strip search rises to the level of outrageousness contemplated by such a claim.

30

Finally, sufficient evidence exists in the record to support a finding that Plaintiff suffered severe emotional distress as a result of Brooks' actions.  For example, Plaintiff claims to have suffered from anxiety, depression and nightmares about the incident.  (Pl.'s Answers to Townsend Interrogatories (ECF No. 91-6) at 9.)  Plaintiff has become increasingly wary of others, especially law enforcement officers, and prefers to stay in her home where she feels safest.  *Id.*  She has sought help from multiple professionals, which has led to a diagnosis of Post Traumatic Stress Disorder, a prescription for mental health medication and a referral to a professional counselor.  *Id.*  These claims represent but a portion of the evidence offered in support of Plaintiff's IIED claim.  The decision of whether to credit these claims and the testimony of the medical professionals offered in support thereof is one better answered by a jury.  For these reasons, the Court denies Brooks' Motion as to Plaintiff's IIED claim.

### 2.    *Townsend*

The IIED claim against also Townsend survives.  In deciding Plaintiff's willful and wanton claim, the Court has already determined that the record could support a finding that Townsend acted with the degree of recklessness or intentionality required for an IIED claim by tacitly authorizing Plaintiff's strip search despite knowledge that this search was not legally authorized.  Also, a jury could reasonably find that knowingly authorizing the wrongful and invasive strip search of an innocent citizen rises to the level of outrageousness contemplated by such a claim.   Finally, Townsend's actions were certainly a causative factor in Plaintiff's emotional distress.  Townsend knew that Plaintiff did not constitute an incoming inmate based on both Plaintiff's statements, Roney's statements and the lack of any verifying documentation; yet, Townsend allegedly told Brooks that Plaintiff was a weekender, which resulted in Brooks

taking Plaintiff into the locker room for the invasive and emotionally damaging search. For these reasons, Plaintiff's IIED claim against Townsend survives.

### D. False Imprisonment Claim

Both Brooks and Townsend challenge Plaintiff's false imprisonment claim. Brooks argues that she did not falsely imprison Plaintiff, because Plaintiff "willingly entered the RRJ of her own volition," and then failed to "sufficiently elucidate her true purpose in entering the jail." (Brooks' Mem. at 20.) She avers that no facts show that Plaintiff had an apprehension that Brooks would use force to prevent her from leaving the jail. Townsend argues that the false imprisonment claim fails as to him, because the evidence does not show that he restrained Plaintiff, or used any force or threat against her. (Townsend's Mem. at 21.) He merely asked her to have a seat while he checked his files for her name. (Townsend's Mem. at 21.)

Virginia defines false imprisonment as "the restraint of one's liberty without sufficient cause." *Zaklit v. Global Linguist Sols., LLC*, 53 F. Supp. 3d 835, 846 (E.D. Va. 2014) (citing *Zayre of Va. Inc. v. Gowdy*, 147 S.E.2d 710, 713 (Va. 1966)). More specifically, "[i]f a person is under a reasonable apprehension that force will be used unless he willingly submits, and he does submit to the extent that he is denied freedom of action, this, in legal contemplation, constitutes false imprisonment." *Zayre*, 147 S.E.2d at 713. Importantly, "it is not necessary to show malice, ill will or the slightest wrongful intention," and the defendant's good faith will not defeat a false imprisonment claim. *Id.*

### 1. Brooks

The facts support the reasonable inference that Brooks falsely imprisoned Plaintiff. Plaintiff states that when she entered the locker room with Brooks, she questioned Brooks as to why an employee of the jail would need to undergo a strip search. Despite Plaintiff informing

32

Brooks of her status as an employee, Brooks continued to order Plaintiff to remove her clothes and proceed with the strip search. Additionally, Plaintiff claims that she asked Brooks whether she could leave to call her agency, and Brooks responded that she could not. According to Plaintiff, Brooks was "persistent" and "authoritative," such that Plaintiff "didn't have any choice" but to submit to Brooks' commands. Furthermore, Brooks told Plaintiff that once you entered the intake area, you cannot go out. A jury could find that a reasonable person in Plaintiff's position would not have felt free to leave Brooks' presence or the locker room. And, the facts as stated by Plaintiff support the inference that Plaintiff reasonably believed that force would have been used against her unless she submitted to Brooks' commands.

### 2. *Townsend*

Viewing the facts in a light most favorable to Plaintiff, a jury could also reasonably find that Townsend falsely imprisoned Plaintiff. Townsend was the officer responsible for accepting Plaintiff through a secure door into the intake area. Plaintiff would not have been able to leave the intake area without the assistance of one of the officers in charge. Townsend directed Plaintiff to a seat but never explained that he planned to verify her purpose for being in the Pre-Release Center. Brooks avers that Townsend told her that Plaintiff had arrived for weekender orientation. He did this knowing that he did not have a file for Plaintiff. Plaintiff saw Townsend point to her during his conversation with Brooks. This occurred just before Plaintiff entered the locker room with Brooks for the strip search, during which Brooks repeatedly told Plaintiff that Plaintiff could not leave. Additionally, Townsend confirmed that Plaintiff could not bring food or her water bottle into the jail and ultimately took Plaintiff's water bottle into his possession.

Based on this testimony that Plaintiff could not leave the Pre-Release Center without the permission and assistance of a correctional officer, the instruction given by Townsend to Brooks

33

that resulted in Plaintiff entering the locker room and being told that she could not leave, Townsend's presence outside of the locker room while Plaintiff's search was underway and the seizure by Townsend of Plaintiff's personal property that she presumably would not feel comfortable leaving the jail without, the record contains facts sufficient to support a conclusion that Townsend effectively restrained Plaintiff's liberty by putting her in reasonable apprehension that she could not voluntarily leave the Pre-Release Center without the use of force against her.

E.     **The Doctrine of Good Faith Immunity Does Not Bar Plaintiff's State Law Claims**

Defendants Brown and Townsend both assert the defense of Virginia's good faith immunity doctrine as to Plaintiff's state law claims.  (Brown's Mem. at 11-12; Townsend's Mem. at 26-27.)  Brown bases his defense on several facts, which he contends point to the reasonableness of his actions, including:  (1) that a jail employee had never arrived at the Pre-Release Center for orientation before; (2) that the Pre-Release Center's distance from the main jail made it logical for Brown to believe that Plaintiff had arrived for weekender orientation; and, (3) that Plaintiff confirmed to Brown that she had arrived at the jail for weekender orientation. (Brown's Mem. at 12.)  Townsend merely states that "the evidence" shows his entitlement to this defense.  (Townsend's Mem. at 27.)

Virginia's good faith immunity defense provides that a law enforcement officer may not be liable for a false arrest when the officer acts "in good faith and with reasonable belief in the validity" of his conduct.  *DeChene v. Smallwood*, 311 S.E.2d 749, 751 (Va. 1984); *Ware v. James City Cnty.*, 652 F. Supp. 2d 693, 712-13 (E.D. Va. 2009) (applying defense to dismiss false imprisonment claims based on an arrest).  As the Supreme Court of Virginia opined in *Jordan v. Shands*, "[a] defendant who asserts the qualified immunity defense, not the plaintiff,

34

must allege and prove the elements comprising this defense." 500 S.E.2d 215, 219 (Va. 1998). Importantly, a defendant "may not . . . shift his pleading and proof burdens to the plaintiff." *Id.*

As to Brown, the defense proves inapplicable. *DeChene* "was about the legality of an arrest, which turned on 'whether the arresting officer acted in good faith and with probable cause,'" and, therefore, its applicability here proves wanting. *Sisson v. Piedmont Reg'l Jail Auth.*, 2020 WL 1307858, at *6 n.2 (E.D. Va. Mar. 19, 2020). Furthermore, even if this Court found the defense applicable in this context, this defense fails, because the record supports a finding that Brown and Townsend did not act "with reasonable belief in the validity" of their conduct.

Indeed, for every fact that Brown raises in support of his argument, other evidence exists in the record to defeat it. For instance, testimony exists that individuals often have difficulty navigating the jail complex and not infrequently report to the Pre-Release Center when they should have reported to a different building, despite Brown's suggestion that he would only encounter inmates outside of the Pre-Release Center. Additionally, while Brown claims that Plaintiff stated that that she had arrived for weekender orientation, Plaintiff testifies that she told Brown that she was a nurse and that she had arrived for her first day of work. Plaintiff denies having heard the word "weekender" on the day at issue. Brown cannot claim immunity based on these disputed facts that go to the reasonableness of his conduct.

Townsend's attempt to assert this defense likewise fails. For one, Townsend makes little effort to specify what "evidence" supports his position. Moreover, as the Court has already found, evidence exists in the record to show that Townsend acted with a high degree of recklessness, such that he certainly could not have possessed a reasonable belief in the validity of his conduct. Namely, Townsend had confirmation from multiple sources (including Plaintiff

herself) that Plaintiff did not constitute an inmate. Yet, he allegedly told Brooks that Plaintiff was an inmate and allowed Brooks to take Plaintiff into the locker room for the strip search. For these reasons, the Court finds that both Brown and Townsend cannot claim the defense of good faith immunity as to Plaintiff's state law claims.

**F.     Fourth and Fourteenth Amendment Claims**

*1.     Brooks*

Brooks argues that the federal doctrine of qualified immunity shields her from suit under Plaintiff's § 1983 claims. The doctrine of qualified immunity "shields government officials from liability for civil damages, provided that their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Wingate v. Fulford*, 987 F.3d 299, 311 (4th Cir. 2021). To determine whether qualified immunity applies, the Supreme Court has established a two-step inquiry in which courts must determine: (1) "whether the facts that a plaintiff has alleged [if resolved on a motion to dismiss] or shown [if resolved on a motion for summary judgment] make out a violation of a constitutional right;" and, (2) "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

While the Supreme Court previously required courts to follow these steps in sequential order, it has since held that "while the sequence set forth [ ] is often appropriate, it should no longer be regarded as mandatory." *Pearson*, 555 U.S. at 236 (discussing *Saucier v. Katz*, 533 U.S. 194 (2001)). Now, "judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Id.*

36

Plaintiff asserts two violations of her constitutional rights:  (1) that Townsend and Brooks unreasonably seized her by preventing her from leaving the female locker room and keeping her in the intake area after the strip search; and, (2) that Townsend and Brooks subjected her to a strip search without legal justification.  (Compl. ¶¶ 126, 132.)  Plaintiff's claims rely on the Fourth Amendment, as incorporated on the States by the Fourteenth Amendment, which explicitly protects the "right of the people . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  Because Brooks concedes that she searched and seized Plaintiff, the Court need only ask:  (1) whether the seizure and search of Plaintiff proved unreasonable; and, (2) if Brooks unreasonably seized and searched Plaintiff, whether the state of the law in September 2019 put Brooks on fair notice that her conduct violated Plaintiff's rights.

> ### i.      Plaintiff Sufficiently Alleges that Brooks Unreasonably Seized and Searched Her.

Ordinarily, whether a seizure proves unreasonable requires "an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time, and not the officer's actual state of mind at the time the challenged action was taken."  *Maryland v. Macon*, 472 U.S. 463, 470-71 (1985) (internal quotations and citations omitted).  Likewise, because "a prison employee . . . does not forfeit all privacy rights when she accepts employment," for a "visual body cavity search" of a prison employee to be reasonable, prison officials must possess "a reasonable and individualized suspicion that an employee is hiding contraband on his or her person."  *Leverette v. Bell*, 247 F.3d 160, 167-68 (4th Cir. 2001); *see also Braun v. Maynard*, 652 F.3d 557, 558 (4th Cir. 2011) (acknowledging that a prison employee's right to be free from intrusive searches without reasonable and individualized suspicion constitutes a "clearly established" right).

However, the Court has previously noted that Plaintiff's claims do not fit squarely within the mold of a standard prison employee case, because Defendants mistook Plaintiff for an inmate whom they could subject to RRJ's intake procedures without this process resulting in a violation of the Constitution.  Importantly, in *Baker v. McCollan*, the Supreme Court held that the arrest and detention of a mistakenly identified individual pursuant to a facially valid warrant does not establish a violation of the Fourteenth Amendment's Due Process Clause, because "[t]he Constitution does not guarantee that only the guilty will be arrested" or require law enforcement officials "to investigate independently every claim of innocence." 443 U.S. 137, 145-46 (1979). However, this case left open the question of whether a government official can violate an individual's Fourth Amendment rights when they seize and search an individual based on a mistake in identity.

The Fourth Circuit has approached this question by combining both the reasonableness of the official's mistake with an analysis of the reasonableness of the search or seizure itself.  For example, in *Brown v. Wiita*, the Fourth Circuit considered a § 1983 claim alleging that officers violated the plaintiff's Fourth Amendment rights by arresting the plaintiff on the mistaken belief that he was an individual named in an indictment.  7 F. App'x 275, 276-77 (4th Cir. 2001).  On appeal, the Fourth Circuit considered whether the arresting officer could claim qualified immunity.  *Id.* at 278.  In concluding that the officer could, the Fourth Circuit found that the arresting officer's mistaken identification of the plaintiff proved reasonable under the circumstances, rendering the arrest of the plaintiff reasonable as well.  *Id.* at 278-79; *see also Hill v. California*, 401 U.S. 797, 802-03 (1971) (finding a mistaken identity arrest justified, because the officers had probable cause to arrest the correct individual and the circumstances presented rendered the officers' mistaken identification reasonable); *Turner v. Kight*, 121 F. App'x 9, 16

(4th Cir. 2005) (upholding finding that officer committed a "reasonable mistake" and not a constitutional violation when officer negligently failed to confirm plaintiff's status as a temporary detainee before undertaking search procedures to process her into the general population).

As the Court has previously found, this approach applies here. Thus, whether Brooks violated Plaintiff's Fourth Amendment rights turns on whether Brooks reasonably believed that Plaintiff was an inmate in light of the facts and circumstances available to her at the time. To that end, the record allows for a finding that Brooks unreasonably believed that Plaintiff was an inmate at the time of her search. Plaintiff told Brooks several times during the search that she worked at the jail. She asked Brooks for permission to leave the locker room to speak to the agency that had sent her. She questioned whether she would have to undergo such a search every time she arrived at the jail for work and emphasized that she would not be able to accept her position if that were true. Taken as true, these statements support conclusion that Brooks' mistaken belief as to Plaintiff's identity was unreasonable. Thus, the jury should decide the reasonableness of Brooks' mistaken identity.

### ii.    The Rights Allegedly Violated by Brooks Were "Clearly Established" in September 2019.

Because the facts viewed in a light most favorable to Plaintiff plausibly establish that Brooks violated her Fourth Amendment rights, the Court must next consider whether the rights violated by Brooks were "clearly established" in September 2019, when the search of Plaintiff occurred. To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotations, alterations and citations omitted). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond

39

debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The "clearly established"

standard balances a plaintiff's interest in vindicating her constitutional rights with the interest of

government officials in "reasonably . . . anticipat[ing] when their conduct may give rise to

liability for damages." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). Accordingly, "the

right allegedly violated must be established not as a broad general proposition, but in a

particularized sense so that the contours of the right are clear to a reasonable official." *Reichle*,

566 U.S. at 665 (internal quotations and citations omitted).

Qualified immunity does not necessitate that "the very action in question has previously

been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). The Supreme Court has held

that "a general constitutional rule already identified in the decisional law may apply with obvious

clarity to the specific conduct in question, even though the very action in question has [not]

previously been held unlawful." *Anderson*, 483 U.S. at 640 (internal quotations and citations

omitted). Thus, "the salient question" becomes whether the state of the law at the time of the

alleged conduct "gave [the government official defendant(s)] fair warning that their alleged

[conduct] was unconstitutional." *Hope*, 536 U.S. at 741.

As stated, the record supports a finding that Brooks mistakenly identifying Plaintiff as an

inmate and not an employee was unreasonable under the circumstances. Therefore, the rights

plausibly violated by Brooks constituted the rights of prison employees not to be subjected to a

strip search and its attendant seizure without reasonable and individualized suspicion of hidden

contraband. The Fourth Circuit has explicitly acknowledged that a prison employee's right to be

free from "intrusive" searches without the requisite suspicion constitutes a "clearly established"

right. *Braun*, 652 F.3d at 558. Thus, if a correctional officer requires reasonable and

individualized suspicion of hidden contraband to subject a prison employee to an intrusive

search, the officer cannot seize an individual for the purposes of such a search without the same suspicion. Consequently, the rights violated by Brooks were clearly established in September 2019.

The Court acknowledges Brooks' testimony that Plaintiff did not make the statements that Plaintiff claims to have made. And, certainly, the accuracy of Plaintiff's account proves nearly dispositive as to the issue of the reasonableness of Brooks' belief (and, consequently, the qualified immunity question). However, the Court cannot assume the role of the fact finder at this stage. Consequently, because this issue turns on numerous disputes of material fact, and Plaintiff has plausibly alleged facts that establish that Brooks unreasonably believed that she was an inmate, qualified immunity will not shield Brooks from suit. The Court therefore denies Brooks' Motion for Summary Judgment as to Plaintiff's § 1983 claims.

### 2. *Townsend*

Townsend contends that the evidence shows that he did not search or seize Plaintiff, because Plaintiff wanted to enter the SP5 door that he opened for her, and Plaintiff willingly entered the female locker room with Brooks without indicating in any way that she wanted to leave. (Townsend's Mem. at 23-24.) He insists that the evidence "shows a consensual encounter with respect to Amisi and Townsend," and that he otherwise did not cause Plaintiff to be seized by Brooks. (Townsend's Mem. at 24.) Townsend also raises a qualified immunity defense in his Reply.

#### i. The Record Allows for a Finding that Townsend Seized and Searched Plaintiff.

The Court disagrees with Townsend's contention that the evidence fails to show that he searched or seized Plaintiff. A "seizure" occurs "when, taking into account all of the circumstances surrounding the encounter, the [correctional officer's] conduct would have

41

communicated to a reasonable person that he was not at liberty to ignore the [officer's] presence and go about his business." *Kaupp v. Texas*, 538 U.S. 626, 629 (2003) (per curiam) (citations omitted).

Disputes exist regarding too many of the material facts surrounding the circumstances of Plaintiff's encounter with Townsend for the Court to conclude at this stage that Townsend did not seize Plaintiff. However, when taken in a light most favorable to Plaintiff as the Court must do at this stage, the record allows for a finding that a reasonable person in Plaintiff's situation would not have felt at liberty to ignore Townsend and leave the intake area. For one, Plaintiff had entered a secure area of the Pre-Release Center, an area that she could not leave without the assistance of a correctional officer. Second, Plaintiff claims that she communicated to Townsend that she was a nurse there for her first day of work. Despite this information, Townsend directed Plaintiff to take a seat in the intake area. Plaintiff then saw Townsend and Brooks talking and observed Townsend point at her. Brooks testifies that Townsend told her that Plaintiff was a weekender who had arrived for orientation. Brooks then immediately took Plaintiff into the locker room for the strip search. These facts support the inference that Townsend worked with Brooks to ensure that Plaintiff would be brought into the locker room for the search.

Additionally, once in the room, Plaintiff was told she could not leave, even after she asked to call her agency. And, Townsend directed the discarding of Plaintiff's lunch and took Plaintiff's water bottle into his possession while Plaintiff continued to remain under Brooks' control. Townsend then waited outside, knowing that Brooks would likely subject Plaintiff to a strip search in the locker room. Given these facts, a reasonable person could conclude that Townsend continued to participate in Plaintiff's seizure.

As to whether Townsend searched Plaintiff, the Court has previously found that Townsend can be held liable for Plaintiff's search under an "effective causation" theory of liability. Specifically, § 1983 "imposes liability not only for conduct that directly violates a right but for conduct that is the effective cause of another's direct infliction of the constitutional injury." *Sales v. Grant*, 158 F.3d 768, 776 (4th Cir. 1998). Therefore, "'[t]he requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.'" *Id.* (quoting *Gutierrez-Rodriguez v. Cartagena*, 882 F.2d 553, 560-61 (1st Cir. 1989)).

Townsend knew that Brooks performed strip searches of incoming inmates in the female locker rooms that she entered with Plaintiff. Townsend knew that he had no record, file or other confirmation that Plaintiff was an incoming inmate. He also knew that Brooks believed Plaintiff to be an incoming inmate. Yet, Townsend allowed Brooks to take Plaintiff into the locker room. Together, these facts support the plausible inference that Townsend effectively caused the search of Plaintiff and did not merely passively observe the deprivation of her rights. He took affirmative steps, including pointing to Plaintiff, referring to her as a weekender and allowing Brooks to take Plaintiff into the locker room without any indication that she was legally committed to the institution, that caused the deprivation to occur. Thus, contrary to Townsend's arguments, the evidence supports a determination that Townsend both seized and searched Plaintiff. The Court now turns to the question of whether this search and seizure was unreasonable.

43

> ii. **The Record Allows for a Finding that Townsend Unreasonably Searched and Seized Plaintiff.**

The analytical framework that applies in determining the constitutionality of Brooks' actions also applies to Townsend's. As stated, whether Townsend violated Plaintiff's Fourth Amendment rights turns on whether Townsend reasonably believed that Plaintiff was an inmate in light of the facts and circumstances confronting him at that time. To that end, the Court finds that the record allows for a finding that Townsend unreasonably believed that Plaintiff was an inmate.

Indeed, the parties dispute many of the facts that go to the reasonableness of Townsend's belief. For example, Plaintiff claims that she specifically told Townsend that she constituted an employee reporting for work; yet, Brown claims that Plaintiff told him she was a weekender. Regardless, Townsend also possessed a list of weekender inmates that did not include Plaintiff's name, and also confirmed through Roney that the jail had no other paperwork confirming Plaintiff's status. Thus, the facts viewed in a light most favorable to Plaintiff support a finding that Townsend unreasonably believed Plaintiff was an inmate (and, as stated, should have known that she was not), and, therefore violated Plaintiff's Fourth Amendment rights. As such, Townsend cannot claim the protections of qualified immunity, as Plaintiff's right as a prison employee to be free from a highly intrusive search absent reasonable and individualized suspicion that she possessed hidden contraband proves clearly established.

Townsend's reliance on *Turner v. Kight* proves inapposite. Townsend suggests that this case stands for the proposition that any strip search wrongfully performed as a result of a mistaken identity cannot result in a constitutional violation. (Brown's Reply at 20.) However, in *Turner*, the court merely held that the strip search of a detainee did not result in a constitutional violation, because the offending officer merely made a "reasonable mistake." 121 F. App'x at

44

16. Here, as stated, the reasonableness of Townsend's mistake remains to be determined by the jury.

Consequently, the Court will not dismiss Plaintiff's constitutional claims against Townsend at this stage. The Court therefore denies Townsend's Motion for Summary Judgment as to Plaintiff's § 1983 claims.

## IV.   CONCLUSION

In sum, Defendants' Motions for Summary Judgment rely in large part on heavily disputed facts or evidence that requires the Court to engage in credibility determinations. Many of the issues raised by Defendants, especially those involving fact-intensive reasonableness determinations, prove questions better answered by a jury. For these reasons, the Court DENIES Defendants' Motions in their entirety.

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Dated: August 16, 2021